[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10569

_____

D.C. Docket No. 1:16-cr-00153-KD-N-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID JESUS JIMENEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(August 25, 2020)

Before WILSON, LAGOA and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, defendant David Jimenez appeals his convictions for

conspiracy to commit immigration-document fraud, in violation of 18 U.S.C. § 371

and the fourth paragraph of 18 U.S.C. § 1546(a), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  After careful review, we affirm Jimenez's three convictions.  We conclude that there was sufficient evidence to convict Jimenez of his fraud-conspiracy offense because the I-140 petitions and certain related documents contained false statements and were required by immigration laws or regulations, within the meaning of 18 U.S.C. § 1546(a).  There was also sufficient evidence to support Jimenez's two money laundering convictions because the immigration-document fraud was an underlying "specified unlawful activity" for purposes of § 1956(a)(1)(A)(i).

## I.  INDICTMENT

Jimenez's convictions arose out of a scheme to obtain fraudulently a particular kind of employment-based visa for "multinational executives and managers," called an EB-1C visa, from the U.S. Citizenship and Immigration Service ("CIS").  Under the scheme, Jimenez recruited and paid U.S. businesses to enter into a fictitious joint venture with a Chinese business.  Jimenez then filed an employer I-140 Petition for Immigrant Worker in the U.S. business's name on behalf of a named Chinese-national beneficiary to classify that beneficiary as an EB-1C multinational executive or manager, even though Jimenez knew that beneficiary would not work for the U.S. business or the joint venture.  Once the I-

2

140 petition was granted, that Chinese-national beneficiary obtained an EB-1C work visa and immigrated to the United States but never actually worked for the U.S. business or the fictitious joint venture.

The indictment[1] charged Jimenez with one count of conspiracy to commit an offense against the United States, that is: immigration-document fraud under the fourth paragraph of 18 U.S.C. § 1546(a), in violation of 18 U.S.C. § 371 (Count 1); several counts of conspiracy to commit wire fraud and wire fraud, in violation of 18 U.S.C. §§ 1343, 1349 (Counts 2 through 7); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 8); and one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Count 9). Because ultimately Counts 2 through 7 were dismissed, we focus on only Jimenez's convictions on Counts 1, 8 and 9.

According to the indictment, the false statements in the I-140 petitions and supporting documentation, which Jimenez and his co-conspirators filed with the CIS, were about the Chinese-national beneficiaries' purported employment with these fictitious joint ventures between the U.S. businesses and Chinese businesses, as follows:

> 8.    To start the process, United States businesses filed I-140 petitions and supporting documents on behalf of these Chinese nationals. In most instances, the petitions and related documents represented that the Chinese nationals were executives at a Chinese

---

[1]By "indictment," we refer to the second superseding indictment filed in this case.

company that had entered into a written joint venture agreement with the United States business, and that said joint venture would be operated in the United States.

> 9.    In most instances, the documentation filed with CIS falsely represented that the Chinese national, upon immigration to the United States, would assume a high-level executive position with the newly formed joint venture.  In reality, however, many of the documents filed with CIS contained forged, fictitious, and materially false representations.  These documents were submitted to CIS as part of an elaborate effort to obtain EB-1C visas for certain Chinese nationals by false and fraudulent pretenses.

The conspirators included people in China, Canada, and the United States.

Defendant Jimenez and named co-conspirator Christopher Dean, as two of the U.S-based co-conspirators, recruited business owners in the United States to use to file the I-140 petitions, joint venture agreements, and related documents.

As to Count 1, the indictment alleged that defendant Jimenez and his co-conspirators, including Christopher Dean, conspired to violate the fourth paragraph of § 1546(a), as follows:

> [T]o knowingly make under oath, and as permitted under penalty of perjury . . . , to knowingly subscribe as true, any false statement with respect to a material fact in any application, affidavit, or other respect to a material fact in any application, affidavit, or other document required by the immigration laws and regulations prescribed thereunder, and to knowingly present any such application, affidavit, or other document which contains any such false statement and which fails to contain any reasonable basis in law or fact, in violation of Title 18, United States Code, Section 1546(a).

The manner and means section of Count 1 alleged that Jimenez and Dean paid the U.S. business owners "for signing documents relating to an I-140

4

petition," providing them with documents, and allowing the petitions to be filed in their businesses' names. Many of the documents Jimenez and his co-conspirators submitted to CIS relating to the joint venture agreements contained materially false information, including being backdated. "In truth, much of the documentation submitted to CIS was materially false, and there was no legitimate business relationship between the Chinese national and the U.S. business filing the I-140 petitions."

The overt acts section of Count 1 stated that Jimenez and his co-conspirators "committed the following overt acts, among others, in the Southern District of Alabama, and elsewhere." Jimenez traveled to Orange Beach, Alabama, where he recruited a local business owner to file an I-140 petition for a specific Chinese national, and, in September 2011, "caused an I-140 petition" in that business's name to be filed and "caused related documents containing materially false information to be submitted to CIS in support of this I-140 petition." Jimenez also traveled to Mobile, Alabama, and did the same thing with another local business owner, causing an I-140 petition to be filed in that business's name in January 2013 and causing "related documents containing materially false information to be submitted to CIS in support of this I-140 petition."

The indictment also listed other overt acts involving the submission of false documents to CIS, including altered invoices, a fictitious lease agreement,

5

photographs falsely depicting the business location and offices, and documents purporting to show that two wire transfers were made to the petitioning U.S. business to fund the business relationship.

As to the money laundering charges in Counts 8 and 9, the indictment alleged that the offenses "involved the proceeds of specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and wire fraud, in violation of Title 18, United States Code, Section 1343."

## II.  GOVERNMENT'S TRIAL EVIDENCE

### A.    Dean and Dean Brothers, Inc.

Prior to Jimenez's trial, co-conspirator Christopher Dean pled guilty to an information charging him with conspiracy to commit money laundering.  See United States v. Dean, 16-cr-000206 (S.D. Ala. Dec. 7, 2016).  Dean testified for the government at Jimenez's trial.

Dean was the general manager of his family's scrap metal and demolition business, Dean Brothers, Inc., near Mobile, Alabama.  In late 2010, friends introduced Dean to defendant Jimenez and a China-based co-conspirator, Tom Wayne, who was Jimenez's father-in-law.  Jimenez pitched to Dean a "program" to allow Chinese nationals to immigrate to the United States by structuring a joint venture between Dean Brothers and a Chinese business, for which Dean would be (and ultimately was) paid $30,000.  Dean agreed, and provided Jimenez with Dean

Brothers's business documents, including tax returns, invoices, and "anything [Jimenez] requested."

Jimenez then filed an I-140 petition in Dean Brothers's name on behalf of Defeng Li, as the Chinese-national beneficiary who ostensibly was to be the executive employed by the joint venture and who would obtain the EB-1C visa to immigrate to the United States. In connection with the I-140 petition, Jimenez submitted a cover letter signed by Dean, and a purported joint venture agreement, also signed by Dean, between Dean Brothers and Defeng Li's Chinese employer, Anhui Sunny Technology, Co. However, the representations made in the I-140 petition and the joint venture agreement—such as about Dean Brothers and Defeng Li working together in the joint venture—were false, as Li never worked for Dean Brothers and there never was a joint venture. Although Dean signed the joint venture agreement in December 2011, it was backdated to August 31, 2010, before Dean had even met Jimenez and Wayne.[2]

After traveling to China and meeting several China-based members of the conspiracy, including Bobby Wang, Dean began working directly for Wang. Dean recruited "eligible U.S. companies" in the same way Jimenez did, "to match [them]

---

[2]In its brief, the government explains that the conspirators backdated the joint venture agreements because they believed (perhaps wrongly) that the regulations required the joint venture to have existed for over a year before the I-140 petition was filed. According to Dean, he initially believed Jimenez's joint venture proposal was legitimate, but he realized it was not when they backdated the joint venture agreement.

with foreign companies to petition for executive directors for immigration purposes." If the business owner agreed to be an I-140 petitioner, Dean asked for the same documents Jimenez had requested from Dean, which were needed to file the I-140 petitions, and then shepherded the documents through to ensure the petition was approved. Dean testified that the documents were falsified or contained misrepresentations to get the petitions approved, and that Jimenez and other conspirators knew this. Dean estimated that he recruited "30-plus" U.S. companies to participate in the scheme, "close to 12" of which had their petitions approved. For his services, Dean netted about "a quarter mill a year" for three years.[3] Wang paid Dean via wire transfers for recruiting the U.S. businesses.[4]

In addition to Dean, the government presented testimony from 15 business owners in Alabama, Florida, Mississippi, and California who were recruited by either Jimenez or Dean to be I-140 petitioners for the EB-1C work visa scheme. All of the witnesses identified I-140 petitions and supporting documents that contained false statements, forged signatures, or materially misleading information.

---

[3]Dean said his pitch, which was similar to Jimenez's pitch, was as follows:
> That we would structure an international joint venture and the venture is not really active so there's not a lot of risk associated with it. And if the Government approves the joint venture or the immigration application, both, then you'll be—the joint venture will be funded with 30K, and you'll possibly have a business partner to do future business, a wealthy business partner.

Dean told the U.S. businesses that the Chinese nationals would not have to show up for work, but he did not tell them he would be filing false documents in support of the petitions.

[4]However, Jimenez paid Dean for the Dean Brothers's I-140 petition by check.

8

Among those business owners who testified were Shannon "Duke" Middleton and Terri Long, and their testimony illustrates how the fraud scheme worked.

## B.    Middleton and Jet Blast in Mississippi

Shannon Duke Middleton was the owner of Jet Blast, a "power sport" dealership in Gulfport, Mississippi.  In 2013, Jimenez contacted Middleton and pitched the idea of paying Middleton to participate in a business venture to help Chinese millionaires immigrate to the United States.  Middleton understood that the prospective Chinese immigrant would never work at his company.

Thereafter, in September 2013, Jimenez caused to be filed with CIS an I-140 petition for an EB-1C visa and supporting documentation in Jet Blast's name on behalf of a Chinese national named Yan Xu.  A cover letter submitted to CIS in support of the I-140 petition referenced that, in December 2011, Jet Blast had entered into a joint venture agreement with a Chinese company, Arden Garments Guangzhou, Co. Ltd., and Yan Xu had been appointed the executive director of the joint venture.  Middleton had never heard of Yan Xu or Arden Garments, did not employ Yan Xu, did not agree to a joint venture, and did not sign a joint venture agreement or any other documents, including the cover letter and a job offer letter, submitted with the I-140 petition.[5]

---

[5]The supporting documentation also included a shared Chinese bank account statement showing a "portfolio" of over $2 million and a $300,000 deposit, a description of Yan Xu's job duties and an organizational chart of the joint venture with Yan Xu as the executive director and

The I-140 petition, purportedly filed by Jet Blast on behalf of Yan Xu, states in Part 2 that the petition is filed for a "multinational executive or manager." Part 6 of the petition represents that Jet Blast will employ Xu in a new, full-time, permanent position, paying her $50,000 per year, with the job title "Executives & Managers." For the "Nontechnical Description of the Job," the petition states: "Establishing long-term and mid-term Company objectives, setting of business plans, and the design of business models for the company; Assigning marketing strategies and reforming the business procedures, and strengthening our distribution and client channels; see job offer letter for more." The cover letter submitted with the I-140 petition and purportedly signed by Middleton states, inter alia, that Arden Garments and Jet Blast have entered into a joint venture agreement and that documents are hereby "submitted to establish that there is a qualifying relationship between Jet Blast and Arden under 8 CFR § 204.5(j)(2)(D)," including: (1) "the Jet Blast Joint Venture Agreement entered on December 1, 2011, and (2) a "Joint Venture Management Conceptual Flow Chart," and (3) a "Bank Confirmation into Joint Venture in the amount of $300,000."[6]

---

containing the names of some of Jet Blast's employees. Middleton had never seen any of these documents before and said they were all false.

[6]Among the co-conspirators' emails, federal investigator Don Herrington found one email from Jimenez to his co-conspirators stating that he would soon finish the joint venture agreement for Jet Blast and a subsequent email from Jimenez sending to his co-conspirators the Jet Blast joint venture agreement that ultimately was submitted to CIS with the Jet Blast I-140

10

The cover letter also states that the partners of the joint venture had appointed Xu as the executive director of the joint venture, and attached multiple documents "to establish the executive position to be offered to Ms. Xu," including a "Job Offer Letter by Jet Blast."  The cover letter includes a section on "Ability to Pay," stating that "petitioner has submitted its 2012 federal tax returns" and Jet Blast's "gross income of $147,273.00 is more than able to pay the beneficiary's proffered wage of $50,000.00 a year."

## C.    Long and Wildflowers Boutique in Alabama

Terri Long and her daughter owned Wildflowers Boutique, a women's clothing store in Orange Beach, Alabama.  In September 2011, defendant Jimenez and his father-in-law Tom Wayne approached Long about a business deal to expand her business and start a clothing label using their connections in China.  To set up the deal, Long had her bookkeeper give Jimenez business documents he requested, such as bank account records and tax documents.

Unbeknownst to Long, Jimenez caused to be filed an I-140 petition for an EB-1C visa in Wildflower Boutique's name on behalf of Weihua Xu as the Chinese beneficiary.  As with Jet Blast's I-140 petition and supporting documents, the I-140 petition and accompanying cover letter filed in Wildflowers Boutique's

---

petition.  In another email to Jimenez, a co-conspirator was trying to get more information about Jet Blast in order to create the fake bank account statement.

11

name represented that Wildflowers Boutique and the Chinese company, Viva Group Co. Ltd, China, had entered into a joint venture, and the joint venture would employ Weihua Xu as a multinational executive or manager.

Long remembered signing documents at Jimenez's request, but she did not know if she signed the I-140 petition. Long remembered meeting Weihua Xu, the Chinese beneficiary, and others once for lunch and a brief tour of her store. However, Jimenez never discussed with Long filing an I-140 petition for a Chinese national or having Weihua Xu work for Long, and Long did not know the Chinese company, Viva Group, listed on the joint venture agreement with Wildflowers Boutique. Long did not recall signing the joint venture agreement and said that the signature on the agreement did not look like hers and that statements in the agreement about a business relationship with Viva Group were false. Long also did not sign the cover letter accompanying the documentation. Although Long received two checks from Jimenez (totaling about $5,000), she never entered into any business relationship with the Chinese businessperson connected to Jimenez. Jimenez's signature on one of the checks closely resembled the witness signature on the joint venture agreement.

### III.  JIMENEZ'S EVIDENCE

Jimenez's expert in immigration law, Kari Ann Fonte, testified that for purposes of an EB-1C visa petition, a joint venture "qualifying relationship" under

12

immigration regulations exists when the U.S. company and the foreign company each own 50 percent of the joint venture.[7]  Fonte said that the joint venture could be established orally, by implication, or by written contract, and whether there is a joint venture is determined by the parties' intent to create a business relationship including a joint venture.  The U.S petitioner's intent would be evidenced by the I-140 petition itself and accompany documents like the job offer letter to the beneficiary.

Fonte said that immigration regulations do not require a written contract to prove the joint venture.  However, Fonte admitted it "would be wise to have a document to evidence" a joint venture in the context of the EB-1C program "because immigration processes, cases, are based on documentation."  Fonte agreed that if there was no agreement between the two parties, there was no joint venture and thus no qualifying relationship.  Further, if there is no qualifying relationship, then the petitioner does not qualify for the EB-1C visa program.

Fonte also testified that "generally, there's three groups of documents that are submitted" along with the I-140 petition—documents pertaining to (1) the beneficiary, (2) the U.S. business that is the petitioner, and (3) the foreign

---

[7]Fonte explained that the immigration regulations define three types of "qualifying relationships" for EB-1C visa purposes: an affiliate, a subsidiary, and a joint venture.  An affiliate is "where the same person or group of persons owns or controls both companies" and a subsidiary is "where one of the companies owns the majority of the other company."

company.  However, Fonte contended that "[t]here's nothing in the regulation that requires specific documents" except for documents to prove the ability to pay and that otherwise the "the statute is silent as to what must be provided in order to establish the legal requirements."

## IV.  JURY'S VERDICT

Both after the government rested and at the close of the evidence, Jimenez moved for a judgment of acquittal, and the district court denied the motions at to Count 1 and Counts 8 and 9.  The district court, however, granted the government's motion to dismiss the wire fraud charges in Counts 2 through 7 with prejudice.

The jury convicted Jimenez on Counts 1, 8 and 9.  The district court imposed concurrent 33-month sentences on each count, followed by three years of supervised release.

## V.  DISCUSSION

### A.    Insufficient Evidence

On appeal, Jimenez argues that the government presented insufficient evidence that the material misrepresentations he conspired to make were in documents "required by the immigration laws or regulations prescribed thereunder," as specified by the fourth paragraph of § 1546(a).  Jimenez contends that "none of the documents containing misrepresentations he was charged with

14

making were legally required." He further maintains that, because the government did not prove the "Visa Fraud" conspiracy in Count 1, there is no "specified unlawful activity" for the money laundering offenses in Counts 8 and 9.

When a defendant has challenged the sufficiency of the evidence by an appropriate motion for judgment of acquittal, we review de novo whether there was sufficient evidence to support a conviction. United States v. Jiminez, 564 F.3d 1280, 1284 (11th Cir. 2009). In reviewing the sufficiency of the evidence, we view the record in the light most favorable to the government, resolving all reasonable inferences in favor of the verdict. Id. We assume that the jury made all credibility choices in support of the verdict. Id. at 1285. The evidence is sufficient if a reasonable jury could find that the evidence established the defendant's guilt beyond a reasonable doubt. Id. at 1284-85.

## B.    False Statements in Immigration Documents

In Count 1, Jimenez was found guilty of conspiracy to commit immigration-document fraud in violation of 18 U.S.C. § 371 and the fourth paragraph of 18 U.S.C. § 1546(a).

To prove a conspiracy under 18 U.S.C. § 371, as alleged in Count 1, the government must show: "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." United

States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003). Here, the charged

unlawful objective was to commit the fraud offense in paragraph four of 18 U.S.C.

§ 1546(a).

Section 1546(a) contains four unnumbered paragraphs, each of which

criminalizes different fraudulent conduct involving immigration documents. 18

U.S.C. § 1546(a); see United States v. Pirela Pirela, 809 F.3d 1195, 1200 (11th Cir.

2015) (interpreting the first paragraph of § 1546(a)). The fourth paragraph of

§ 1546(a) criminalizes making a sworn false statement in a document "required by

the immigration laws or regulations," as follows:

> Whoever knowingly makes under oath, or as permitted under penalty
> of perjury under section 1746 of title 28, United States Code, knowingly
> subscribes as true, any false statement with respect to a material fact in
> any application, affidavit, or other document required by the
> immigration laws or regulations prescribed thereunder, or knowingly
> presents any such application, affidavit, or other document which
> contains any such false statement or which fails to contain any
> reasonable basis in law or fact—[commits an offense under this
> section].

18 U.S.C. § 1546(a) (emphasis added). As charged in Jimenez's indictment, the

government was required to prove beyond a reasonable doubt that Jimenez:

(1) conspired; (2) to knowingly make a false statement under oath or to knowingly

subscribe under penalty of perjury that a false statement was true; (3) the false

statement was "with respect to a material fact"; and (4) the false statement was

made in a document "required by the immigration laws and regulations."

16

Jimenez's sufficiency-of-the-evidence challenge concerns only this last element of the conspiracy's charged objective.

The two questions in this appeal are: (1) whether an I-140 petition is a document "required by the immigration laws or regulations"; and if so, (2) whether the government presented sufficient evidence of false statements being made in the I-140 petitions involved here.

## C.    I-140 Petitions and § 1546(a)

On appeal, Jimenez argues that none of the documents the government introduced at trial qualify as "other document[s] required by the immigration laws or regulations" for purposes of § 1546(a)'s fourth paragraph. We disagree for two reasons. First, an I-140 petition undoubtedly falls within the "other document[s]" clause of § 1546(a)'s fourth paragraph.

Section 203(b)(1) of the Immigration and Nationality Act ("INA") gives a preference to "employment-based immigrants" in certain classes of "priority workers." See INA § 203(b)(1), 8 U.S.C. § 1153(b)(1). One of these classes is multinational executives and managers. Id. § 203(b)(1)(C), 8 U.S.C. § 1153(b)(1)(C). An alien seeking classification as a multinational executive and manager under § 203(b)(1)(C) must have been employed for one year, within the last three years, by a firm, corporation, "or other legal entity or an affiliate or subsidiary thereof," and must be seeking to enter the United States to continue

17

rendering services to the same employer "or to a subsidiary or affiliate thereof in a capacity that is managerial or executive." Id. The employment-based visa issued to the alien as a multinational executive and manager is called an EB-1C visa.

Under the implementing regulations, the U.S. employer "desiring and intending to employ" the alien files the petition seeking the alien's classification as an EB-1C multinational executive or manager. 8 C.F.R. § 204.5(c). The petition to classify the alien "under section 203(b)(1) . . .[of the INA] must be filed on Form I-140, Petition for Immigrant Worker." 8 C.F.R. § 204.5(a), (j)(1). The Form I-140 petition "is considered properly filed if it is," among other things, "[a]ccompanied by any other required supporting documentation." Id. § 204.5(a)(3). Notably, the Form I-140 petition requires the petitioner to certify under penalty of perjury that "this petition and the evidence submitted with it are all true and correct."

Second, a document demonstrating the qualified relationship for the EB-1C visa program also falls within the "other documents" clause. Specifically, § 204.5(j) of the regulations contains definitions and additional requirements pertaining to employer petitions filed as part of the EB-1C visa program for multinational executives or managers. 8 C.F.R. § 204.5(j)(2)-(3). In a subsection entitled "Required evidence," the regulation states that the I-140 petition "must be accompanied by a statement from an authorized official of the petitioning United

18

States employer which demonstrates," among other things, that "[t]he prospective employer in the United States is the same employer or a subsidiary or affiliate of the firm or corporation or other legal entity by which the alien was employed overseas." Id. § 204.5(j)(3)(i). A "subsidiary" is defined to include "a firm, corporation, or other legal entity of which a parent owns . . . directly or indirectly, 50 percent of a 50-50 joint venture and has equal control and veto power over the entity." Id. § 204.5(j)(2).

In other words, the relevant regulations require the petitioning U.S. employer to submit an I-140 petition accompanied by another document—a statement by an authorized official—demonstrating a qualifying relationship—in this case a joint venture relationship—between the prospective U.S. employer and the overseas employer. Before filing the I-140 petition, the U.S. employer must swear that its contents and the accompanying statement are true and correct. Under the circumstances, we have little trouble concluding that an employer's I-140 petition and the required accompanying statement demonstrating the qualifying relationship for purposes of the EB-1C visa program both fall within the meaning of § 1546(a)'s "other document required by the immigration laws or regulations." 18 U.S.C. § 1546(a). Further, the government introduced cover letters to the I-140 petitions falsely stating that the U.S. and Chinese companies had entered into joint venture agreements, along with the false joint venture

19

agreements.  Accordingly, a reasonable jury could have convicted Jimenez of conspiring to violate the fourth paragraph of § 1546(a) based on the evidence presented at trial.

Jimenez points to another provision in 8 C.F.R. § 204.5, which requires all petitions for employment-based immigration with an offer of employment to demonstrate that the U.S employer has the ability to pay the prospective employee.  See 8 C.F.R. § 204.5(g)(2).  Subsection (g)(2) requires evidence of the ability to pay to "be either in the form of copies of annual reports, federal tax returns, or audited financial statements."  Id.  Jimenez contends that these financial documents a U.S. employer must submit are the only "required" documents for an I-140 petition seeking an EB-1C visa.

Jimenez's argument not only ignores § 204.5(j), but it also ignores § 204.5(g)(1).  Subsection (g)(1), entitled "General," states that "[s]pecific requirements for initial supporting documents for the various employment-based immigrant classifications are set forth in this section," which is true.  8 C.F.R. § 204.5(g)(1).  Various subsections of 8 C.F.R. § 204.5 contain specific document requirements for each of the types of employment-based petitions permitted under INA § 203(b)(1).  See, e.g., 8 C.F.R. § 204.5(h) (requiring certain documentation and evidence for aliens with extraordinary ability).  Section 204.5(g)(1) clarifies that "ordinary legible photocopies" of these specific supporting documents

20

generally are acceptable for initial filing and approval.  Id. § 204.5(g)(1).  Thus,

§ 204.5(g) recognizes that other supporting documents are required besides the

documents showing an employer's ability to pay, and for alien multinational

executives and managers seeking EB-1C visas, the other required supporting

documents can be found in § 204.5(j).[8]

## D.    Sufficiency of the Evidence of False Statements in I-140 Petitions

A reasonable jury could conclude from the trial evidence that Jimenez

conspired to commit a § 1546(a) offense by making false statements in I-140

petitions on behalf of Chinese-national beneficiaries seeking EB-1C employment-

based visas and in the accompanying statements (the cover letters) demonstrating a

qualifying joint venture relationship.  At trial, the government introduced

numerous I-140 petitions that Jimenez and his co-conspirators filed with CIS in

order to obtain EB-1C employment-based visas for Chinese nationals, including in

the name of Dean Brothers, Wildflower Boutique, and Jet Blast.  Each I-140

---

[8]Section 204.5(g)(2) requires certain documents, such as tax returns and annual reports, to show the U.S. employer's ability to pay, but then states that "[i]n appropriate cases" the petitioner "may" submit other kinds of documents, such as "profit/loss statements, bank account records or personnel records."  8 C.F.R. § 204.5(g)(2).  Jimenez argues that in his case only "optional" as opposed to "required" documents were introduced at his trial.  Jimenez's arguments ignore all the I-140 petitions and the accompanying statements of the qualifying joint venture relationship that were also introduced at trial.  The I-140 petitions and cover letters containing statements demonstrating joint ventures are clearly documents "required" by 8 C.F.R. § 204.5(j)(1) and (j)(3)(i)(C).  The government's case was about these fictitious joint ventures concocted to allow Chinese nationals to immigrate.  While the conspirators created fake ability-to-pay documents along with everything else they fabricated, the government's case did not rest on the ability-to-pay documents.

petition contained a certification, purportedly signed by the petitioner and made under penalty of perjury, that "this petition and the evidence submitted with it are all true and correct."

At trial, numerous business owners, such as Terri Long, Duke Middleton, and co-conspirator Christopher Dean, testified that these I-140 petitions, filed in their businesses' names, were fundamentally false because the businesses did not offer to, and never did, employ the named Chinese-national beneficiary as an executive or manager of any joint venture. The business owners further testified that much of the supporting documentation submitted with the I-140 petitions, including, inter alia, the cover letters stating that the U.S. and Chinese companies had entered joint ventures, and copies of the joint venture agreements and job offer letters, contained false statements because there was no joint venture with a Chinese company or a job offer for a Chinese national. Moreover, some business owners, including Terri Long and Duke Middleton, testified that their signatures had been forged on the I-140 petition or the supporting documentation, or both.

Jimenez contends that the only documents that can be considered on appeal are those "charged in the indictment" as containing material misrepresentations. Jimenez then identifies these documents as "documents relating to wire transfers, false invoices; a fictitious lease; and misleading photos" which were alleged in the

22

"overt acts" portion of the second superseding indictment, and argues that none of them are "required by law."

Jimenez's argument fails for two reasons.  First, in reviewing the sufficiency of the evidence supporting Jimenez's conspiracy conviction, we are not limited to the particular documents mentioned in the indictment as part of the conspiracy's overt acts.[9]  In fact, the indictment itself states that the alleged overt acts occurred "among others," indicating that these acts are just some of the acts the conspirators took in furtherance of the conspiracy.  Rather, to determine whether the government presented sufficient evidence of "other document[s] required by the immigration laws or regulations," we may examine all of the evidence introduced at trial.  See United States v. Alejandro, 118 F.3d 1518, 1520-21 (11th Cir. 1997) (explaining that when reviewing the sufficiency of the evidence, we "examine all of the evidence").

Second, and in any event, Count 1 of the indictment alleged other documents, besides those identified in Jimenez's appellate brief, that contained materially false statements, including "at least nine" I-140 petitions and related documents, including joint venture agreements, offered in support of the I-140

---

[9]Notably, the overt acts did not need to directly involve any element of a § 1546(a) offense, such as a "document required by the immigration laws or regulations," because overt acts may be innocent acts, so long as they are taken in furtherance of the conspiracy.  See United States v. Campa, 529 F.3d 980, 1002 (11th Cir. 2008).

23

petitions.  In addition, in listing some of the overt acts taken by the conspirators, the indictment alleged that Jimenez and his co-conspirators caused I-140 petitions and related documents containing materially false information to be submitted to CIS in the name of local businesses in Orange Beach, Alabama (i.e., Wildflower Boutique) and Mobile, Alabama (i.e., Dean Brothers).  At trial, the government presented ample, if not overwhelming, evidence to support a jury finding that the conspirators caused both I-140 petitions and accompanying statements demonstrating qualifying joint venture relationships to be filed with CIS in the names of Wildflower Boutique and Dean Brothers and that these documents, required by 8 C.F.R. § 204.5(j)(1) and (j)(3)(i) respectively, contained materially false statements.

Because there is sufficient evidence for a reasonable jury to convict Jimenez of conspiracy to commit immigration-document fraud, a reasonable jury also could convict Jimenez of conspiracy to commit money laundering and money laundering. The only issue Jimenez raises on appeal with respect to these convictions in Counts 8 and 9 is that these convictions cannot stand without a "specified unlawful activity."  See United States v. Johnson, 440 F.3d 1286, 1294 (11th Cir. 2006) (stating that to prove a conviction under 18 U.S.C. § 1956(a)(1)(A)(i) and (h), the government must prove, inter alia, that the defendant conducted a financial transaction involving the proceeds of an unlawful activity, "with the intent to

24

promote the specified unlawful activity"). Counts 8 and 9 of the indictment listed "visa fraud" as one of the two "specified unlawful activities" in Jimenez's money laundering offenses, and the evidence presented at trial demonstrated that Jimenez and co-conspirators carried out a visa fraud scheme by authoring and filing false I-140 petitions and supporting documentation demonstrating a qualifying joint venture relationship.

Accordingly, we affirm Jimenez's convictions on Counts 1, 8 and 9.[10]

**AFFIRMED.**

---

[10]On appeal, Jimenez appears to claim his indictment is legally insufficient. However, Jimenez did not raise this issue in the district court and, to the extent he has raised it here, he has shown no plain error in his indictment.