[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11107

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

APPROXIMATELY $299,873.70 SEIZED FROM
A BANK OF AMERICA ACCOUNT,
ending in the number 5538 held by an individual identified as
P.Q., et al.,

Defendants,

APPROXIMATELY $281,110.00 SEIZED FROM
AN EAST WEST BANK ACCOUNT,
ending in the number 2471 held by an individual identified as

Z.D.,

APPROXIMATELY $297,110.00 SEIZED FROM

AN EAST WEST BANK ACCOUNT,

ending in the number 4817 held by an individual identified as

W.H.,

APPROXIMATELY $249,816.00 SEIZED FROM

AN EAST WEST BANK ACCOUNT,

ending in the number 8289 held by an individual identified as

H.C.,

APPROXIMATELY $299,983.49 SEIZED FROM

A J.P. MORGAN CHASE ACCOUNT,

ending in the number 0350 held by an individual identified as

L.G.,

APPROXIMATELY $278,952.11 SEIZED FROM

AN EAST WEST BANK ACCOUNT,

ending in the number 4841 held by an individual identified as

M.Y.,

Defendants-Appellants.

————————————

Appeals from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:16-cv-00545-KD-N

————————————

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and SCHLESINGER,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

The main issue on appeal is whether foreign nationals have a constitutional right to enter the United States to attend a civil forfeiture trial involving their property. Several Chinese nationals paid hundreds of thousands of dollars to an expansive, multinational criminal enterprise to obtain immigration visas based on non-existent employment at non-existent businesses. The United States brought an *in rem* action to forfeit money the Chinese nationals deposited in American bank accounts as part of the visa scam. Some of the Chinese nationals were unable to enter the United States to attend the trial, but they were represented by counsel throughout the proceedings. Five Chinese nationals who received unfavorable verdicts argue that their inability to attend trial violated the Due Process Clause of the Fifth Amendment. Because the district court did not violate the Due Process Clause and we discern no other basis to disturb the jury's verdict, we affirm.

## I. BACKGROUND

The EB-1C immigration visa permits "[c]ertain multinational executives and managers" to move to the United States "to continue to render services to the same employer" for whom they

---

[*] Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

worked abroad "or to a subsidiary or affiliate thereof." 8 U.S.C. § 1153(b)(1)(C). Like other employment-based visas, the EB-1C visa provides the recipient a basis for becoming a lawful permanent resident and perhaps later a citizen.

A group of Americans and co-conspirators based in China schemed to obtain EB-1C visas fraudulently for Chinese nationals. The conspirators would solicit from an American business certain "business documents, including tax returns[] [and] invoices." *United States v. Jimenez*, 972 F.3d 1183, 1187 (11th Cir. 2020). The conspirators would then file an immigration-visa petition on behalf of a Chinese client, falsely representing in the petition that the client's Chinese employer had entered into a joint venture with the American business. *Id.* at 1185, 1187–89. After the government granted the petition, the "Chinese-national beneficiary [would] obtain[] an EB-1C work visa and immigrate[] to the United States but [would] never actually work[] for the [domestic] business or the fictitious joint venture." *Id.* at 1185. To make the joint venture appear legitimate, the conspirators instructed each client to deposit about $300,000 into an American bank account that the client owned. The clients complied.

Investigators from the Department of Homeland Security and the Internal Revenue Service learned of the scheme after hearing about an individual in Alabama soliciting American businesses to petition for foreign nationals to come into the United States to work for them. The United States secured the conviction of four of the leaders of the criminal scheme, but it did not prosecute any of

the Chinese clients. Instead, it brought an *in rem* action in the district court seeking forfeiture of the funds the clients had moved into domestic bank accounts as part of the scheme. Fourteen Chinese nationals filed claims for the funds in thirteen of the seized accounts.

In August 2019, the attorney for some of the Chinese nationals told the district court that the State Department had denied four of his clients a visa to attend the forfeiture trial, set for October. The Assistant United States Attorney explained that his office had no power to direct the State Department to grant the visas and that it understood the denials "were, at least in part, because [the Chinese nationals] had previously attempted to obtain EB-1C immigration visas through a proven criminal fraud scheme." The United States Attorney worked with the Chinese nationals' attorney and the Department of Homeland Security to try and obtain parole letters granting the four Chinese nationals entry into the country without a visa, but there was insufficient time before trial to complete the process.

On October 8, 2019, a week before trial, the four Chinese nationals filed a motion to dismiss the forfeiture claims against their funds. The Chinese nationals argued that their inability to attend trial in person violated the Due Process Clause of the Fifth Amendment by preventing them from presenting a statutory "innocent-owner" defense. *See* 18 U.S.C. § 983(d)(1) ("An innocent owner's interest in property shall not be forfeited[.]"). The district court denied the motion. The district court explained that the

Chinese nationals had not "sought other means to present their testimony," such as by video conference, and that their counsel would be able "to present their . . . innocent owner defense, and cross examine the witnesses."

At trial, the United States presented evidence of the criminal scheme, the Chinese nationals' involvement in the scheme, and their transfer of funds into domestic bank accounts as part of the scheme. All the Chinese nationals were represented by counsel at trial. Four Chinese nationals attended the trial in person and testified on their own behalf. None of the others called witnesses as part of their case-in-chief.

Min Yang, one of the Chinese nationals, asked the district court to instruct the jury that the government bore the burden of proving that the Chinese nationals transferred the money into the United States "with the intent to promote the carrying on of the alleged criminal visa fraud scheme." The district court rejected the request. Instead, it instructed the jury that the government bore the burden of proving that the "funds made the . . . visa fraud scheme easy or less difficult or ensured that the scheme would be more or less free from obstruction or hinderance." In their closing statements to the jury, all the Chinese nationals argued that the government had not satisfied its burden of proof and that they were entitled to recover the seized funds because they were innocent owners who were unaware of the criminal conduct.

The jury found that the United States had satisfied its burden of proof as to all the funds. The jury also found that five Chinese

nationals—four of whom had testified—had proved that they were innocent owners entitled to the return of their funds. It rejected the innocent-owner defense of the remaining Chinese nationals. And the district court denied a motion by Min Yang for judgment as a matter of law or for a new trial.

## II. STANDARDS OF REVIEW

Two standards govern our review. We review whether a due process violation occurred *de novo*. *Stansell v. Revolutionary Armed Forces of Colom.*, 771 F.3d 713, 725 (11th Cir. 2014). We also review *de novo* a ruling on a motion for judgment as a matter of law. *See Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312 (11th Cir. 2013). And we review for abuse of discretion both a refusal to give a requested jury instruction, *id.* at 1309, and a denial of a motion for a new trial, *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001).

## III. DISCUSSION

Five Chinese nationals who lost at trial—Dai Ze, Hong Wei, Hongtu Chen, Linlin Guo, and Min Yang—ask us to vacate the judgment in favor of the government. They argue that their absence from trial violated the Due Process Clause of the Fifth Amendment. Min Yang also argues that the jury instruction was incorrect and that he is entitled to judgment as a matter of law or a new trial because the evidence establishes that he was an innocent owner entitled to the return of his funds.

We divide our discussion in three parts. We first explain why there was no violation of the Due Process Clause. Next, we explain that the district court correctly denied Min Yang's challenge to a jury instruction regarding the government's burden of proof. Finally, we reject Min Yang's argument that he is entitled to judgment as a matter of law or a new trial.

## A. The Chinese Nationals Had No Due Process Right To Enter the Country To Attend Trial in Person.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of . . . property, without due process of law." U.S. CONST. amend. V. It guarantees "notice and an opportunity to be heard" to "[i]ndividuals whose property interests are at stake." *Stansell*, 771 F.3d at 726 (quoting *Dusenbery v. United States*, 534 U.S. 161, 167 (2002)). And "[w]here a district court exercises its jurisdiction over property within the United States," we have held that this constitutional protection extends to "the owners of that property . . . regardless of their location or nationality." *Id.* at 725. The Chinese nationals argue that the Due Process Clause afforded them the right to enter the United States to attend trial. We disagree.

Because "'[t]he requirements of due process of law are not technical,'" "they resist mechanical application." *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. de Navegacion*, 773 F.2d 1528, 1535 (11th Cir. 1985) (en banc) (quoting *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 610 (1974)). Instead, the procedures required to ensure "the opportunity to be heard . . . are the result of

particular needs in particular contexts." *Id.* And when considering the process due in a particular context, historical practice is instructive because "[a] process of law . . . must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country." *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 619 (1990) (plurality opinion) (quoting *Hurtado v. California*, 110 U.S. 516, 528 (1884)); *see also Schiffahartsgesellschaft Leonhardt*, 773 F.2d at 1535 ("'Due process' is compounded of history, reason, and the past course of decisions." (alterations adopted) (internal quotation marks omitted)). So we consider what process is and historically has been due for foreign nationals in civil litigation.

To begin, "[t]he civil, not criminal, nature of [the] trial is important." *Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005). The Supreme Court has held that the Sixth Amendment, read in the light of "the long history of British criminal jurisprudence," *Faretta v. California*, 422 U.S. 806, 821 (1975), guarantees a criminal defendant the personal right to attend trial, *see United States v. Crosby*, 506 U.S. 255, 259 (1993) ("It is well settled that at common law the personal presence of the defendant is essential to a valid trial and conviction on a charge of felony." (alteration adopted) (internal quotation marks omitted)). But when it comes to civil litigation, where the Sixth Amendment does not apply, history points in the other direction.

Since the thirteenth century, civil litigants have relied on attorneys to represent them in court. THEODORE F. T. PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW 216–17 (5th ed. 2001); *see*

*also Faretta*, 422 U.S. at 823 ("[A] right to counsel developed early in civil cases . . . ."); *Iannaccone v. Law*, 142 F.3d 553, 557 (2d Cir. 1998) ("Under the English common law with its complicated forms of action and veritable maze of writs and confusing procedures, the right to retain counsel in civil proceedings became a necessity."). For as long, courts have treated an attorney's "appearance or default" as "equivalent to that of his master." PLUCKNETT, *supra*, at 216. And, more recently, the Supreme Court has explained that "the right to be heard[] entitles the parties . . . to be present in person *or by counsel* at all proceedings." *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 81 (1919) (emphasis added). Because "our system of representative litigation," *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 92 (1990), bears "the sanction of settled usage both in England and in this country," we may "take[] to be due process of law" the presence of an attorney at a civil trial in the place of the litigant himself, *Burnham*, 495 U.S. at 619 (plurality opinion) (quoting *Hurtado*, 110 U.S. at 528); *see Davidson v. Desai*, 964 F.3d 122, 129 (2d Cir. 2020) (explaining that a represented civil litigant's "opportunity . . . to present his case to the court . . . typically can be accomplished even when the litigant is not physically present at the courthouse" (internal quotation marks omitted)).

The Chinese nationals challenge the decision to deny them entry into the United States, but "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the [g]overnment's political departments largely immune from judicial control." *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018)

(internal quotation marks omitted). And, "[f]or more than a century," the Supreme Court has held that "foreign nationals seeking admission have no constitutional right to entry." *Id.* at 2418–19; *see, e.g., Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." (internal quotation marks omitted)); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[A]n alien who seeks admission to this country may not do so under any claim of right."); *Wong Wing v. United States*, 163 U.S. 228, 231 (1896) ("[T]he right to exclude . . . aliens, . . . absolutely or upon certain conditions, in war or in peace, is an inherent and inalienable right of every sovereign and independent nation."). Accepting the Chinese nationals' argument that due process mandated their entry into the United States would require us to disobey these unequivocal and broad holdings.

The district court afforded the Chinese nationals due process. Each Chinese national was represented by an attorney throughout the civil-forfeiture proceedings, including at trial. And each attorney had the "opportunity to defend [against the forfeiture claim] by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970). So, the Chinese nationals received an "opportunity to be heard . . . in a meaningful manner." *Id.* at 267. And it is of no moment that the Chinese nationals were unable to enter the

United States or to attend trial in person. *See Davidson*, 964 F.3d at 129 ("A litigant has no constitutional right to be present . . . at his own civil trial." (internal quotation marks omitted)); *Kulas v. Flores*, 255 F.3d 780, 786 (9th Cir. 2001) (similar); *Pollard v. White*, 738 F.2d 1124, 1125 (11th Cir. 1984) ("The right to access [the courts] does not necessarily mean the right to be physically present at the trial of a civil suit.").

The Chinese nationals rely on *Helminski v. Ayerst Laboratories* for the proposition that "a plaintiff who can comprehend the proceedings and aid counsel may not be excluded from any portion of the proceedings absent disruptive behavior or a knowing and voluntary waiver," 766 F.2d 208, 216–17 (6th Cir. 1985), but that decision is inapposite. In *Helminski*, the district court ruled that the plaintiff, a developmentally disabled child, "could not be brought into the courtroom during the liability phase of the proceedings" because his presence would unduly prejudice the jury. *Id.* at 212. So, on appeal, our sister circuit had to "determine the extent of a civil litigant's right to be present at the trial of his case when the opposing party alleges that his mere appearance before the jury would be prejudicial," *id.* at 213—an issue not presented here. Because the due-process inquiry is context-specific, *Helminski* tells us little about the Chinese nationals' putative right to enter the country to attend trial.

The Chinese nationals also argue that their exclusion violated their constitutional right to present a statutory innocent-owner defense, but they cite no authority in support of such a

constitutional right. *Cf. Davidson*, 964 F.3d at 129 ("A litigant has no constitutional right . . . to testify[] at his own civil trial." (internal quotation marks omitted)). And there is no evidence to suggest that Hong Wei, Hongtu Chen, or Min Yang ever applied for an entry visa to attend trial.

The Chinese nationals' argument proceeds from the mistaken premise that in-person testimony was the only available method of presenting their defense to the jury. *Cf. United States v. Shalhoub*, 855 F.3d 1255, 1264 (11th Cir. 2017) ("The guarantee of due process is not violated whenever a defendant dislikes the process offered."). A witness need not always testify in person. For example, the Federal Rules of Civil Procedure permit "testimony in open court by contemporaneous transmission from a different location" when there is "good cause in compelling circumstances and with appropriate safeguards[.]" FED. R. CIV. P. 43(a). "[C]ircuit and lower courts alike have found a witness's immigration status to constitute good cause," including in circumstances where the witness has "repeatedly be[en] denied a visa to enter the United States." *Rodriguez v. Gusman*, 974 F.3d 108, 114 (2d Cir. 2020).

Those Chinese nationals who applied for visas learned in January 2019 that the State Department had denied their applications. But, as the district court stated, in the nine months between the denials and the start of trial, the Chinese nationals made no apparent effort to "s[eek] other means to present their testimony" at trial—even after the district court reminded them of the possibility of presenting evidence through "affidavits, or . . . video

conferencing." The Chinese nationals' failure to testify in support of their innocent-owner defense is not attributable to their exclusion from the country and is not a violation of due process. After all, the Chinese nationals were "afforded an opportunity to be heard" and "had the opportunity to present evidence." *Stansell*, 771 F.3d at 741. "They simply did not present any evidence that changed" the jury's mind. *Id.*

Finally, the Chinese nationals' other efforts to establish that their absence harmed their defense are unconvincing. They complain that the government, in closing arguments, mentioned that "[f]or nine claimants, you heard no evidence [of innocent ownership]." But the government's point was that the nine Chinese nationals had offered no testimony, in any form, in support of their defense—not that some Chinese nationals were absent from the courtroom. And no Chinese national contemporaneously objected to that argument. *See* FED. R. EVID. 103(a) (requiring a party wishing to preserve an evidentiary objection to "timely object[] or move[] to strike"). It is of little probative value that every Chinese national who attended and testified at trial received a favorable verdict—so did one of the absent Chinese nationals. And it is unsurprising that litigants who chose to present affirmative evidence to satisfy their burden of proof fared better than litigants who chose to offer no evidence. Moreover, Min Yang faced setbacks that were unrelated to his absence. The lawyer he retained for most of the proceedings was not a litigator, did not speak English as his first

language, hardly engaged with the other parties' efforts to draft a pretrial order, and withdrew a month before trial.

The Chinese nationals have failed to establish that their absence from trial violated their constitutional rights. They have also failed to establish that any purported violation had "a substantial influence on the outcome of [the] case." *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1254 (11th Cir. 2020) (internal quotation marks omitted); *cf. Stansell*, 771 F.3d at 744 (concluding that "[t]he appellants' arguments regarding an alleged denial of due process . . . lack merit because any such violation was harmless"). We reject their due-process challenge.

## B. The District Court Correctly Instructed the Jury about the Burden of Proving Intent.

Under federal law, the United States may "subject to forfeiture . . . [a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [the money-laundering statute,] section 1956 . . . of this title[.]" 18 U.S.C. § 981(a)(1), (1)(A). "[T]he burden of proof is on the [g]overnment to establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]" *Id.* § 983(c)(1). And when "the [g]overnment's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the [g]overnment [must] establish that there was a substantial connection between the property and the offense." *Id.* § 983(c)(3). The district court instructed the jury that, "[t]o prove substantial connection, the [g]overnment must prove

16                    Opinion of the Court                    20-11107

by a preponderance of the evidence that the use of the defendants' funds made the money laundering to promote visa fraud scheme easy or less difficult or ensured that the scheme would be more or less free from obstruction or hinderance."

At trial, the government satisfied its burden. It proved the existence of "a transaction or attempted transaction in violation of" the money-laundering statute, *id.* § 981(a)(1)(A), through testimony about the criminal scheme. It also proved that the Chinese nationals' funds were "involved in" the scheme, *id.*, and were "substantial[ly] connect[ed]" to the scheme, *id.* § 983(c)(3), through evidence that the conspirators directed the Chinese nationals to transfer the funds so that the non-existent joint ventures would appear to be legitimate, *see United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010) ("Substantial connection may be established by showing that use of the property made the prohibited conduct less difficult or more or less free from obstruction or hindrance." (internal quotation marks omitted)).

Min Yang argues that the instruction was incorrect and that the rejection of his proposed alternative was erroneous because the intent of the owner of the seized property is "an essential element of [the government's] claim." He explains that the money laundering statute proscribes the transfer of funds into the United States "with the intent to promote the carrying on of specified unlawful activity," including visa fraud. 18 U.S.C. § 1956(a)(2); *see Jimenez*, 972 F.3d at 1194 (holding that visa fraud counts as a specified unlawful activity). And so, he reasons, the "substantial connection"

element requires the government to prove that the owner of the seized funds transferred those funds "with the intent to promote the carrying on of the alleged criminal visa fraud scheme." In other words, Min Yang argues that the government may only subject to forfeiture funds involved in money laundering if the government proves that the owner himself committed the offense of money laundering.

Min Yang's argument finds no support in the text of the governing statute. Section 981 requires the "involve[ment]" only of the "*property*" in a criminal act. 18 U.S.C. § 981(a)(1)(A) (emphasis added). After all, "[c]ivil forfeiture is a proceeding *in rem*," which has historically treated the inanimate property "as being itself guilty of the wrongdoing, regardless of its owner's conduct." *United States v. Funds in the Amount of One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018) (internal quotation marks omitted); *see J. W. Goldsmith, Jr.-Grant Co. v. United States*, 254 U.S. 505, 510–11 (1921) (describing the ancient roots of this legal fiction). In other words, "the government [ordinarily] need not prove a[n] [owner's] culpability for unlawful conduct to obtain a forfeiture." *$100,120.00*, 901 F.3d at 768. Subsection 983(c)(3) similarly omits any mention of the owner's role when it requires proof of "a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). And the subsection that follows it dispels any doubt about the burden of proving the owner's intent.

Subsection 983(d), which describes the innocent-owner defense, provides that the "*claimant*"—here, Min Yang—"ha[s] the burden of proving that [he] is an innocent owner." 18 U.S.C. § 983(d)(1) (emphasis added). An owner may satisfy his burden by proving that he "did not know of the conduct giving rise to forfeiture." *Id.* § 983(d)(2)(A)(i). And the subsection contemplates a case where an owner must prove his innocence even though he "acquired" "a property interest . . . *after* the conduct giving rise to the forfeiture has taken place." *Id.* § 983(d)(3)(A) (emphasis added). The owner's innocence generally—and his intent specifically—are part of a claimant's affirmative defense, with the claimant bearing the burden of proof. Subsection (d) would serve no purpose if, as Min Yang suggests, the burden of proving the fault of the owner fell on the government in the first instance. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 26, at 174 (2012) ("If possible, every . . . provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

*United States v. Dollar Bank Money Market Account No. 1591768456*—a decision regarding structuring, an unrelated kind of money laundering—does not help Min Yang. 980 F.2d 233 (3d Cir. 1992). The Third Circuit explained that, in civil-forfeiture proceedings based on structuring, the government bore the burden of proving "that the property was involved in a transaction violating" one of the anti-structuring statutes. *Id.* at 236. The Third Circuit

then stated that this showing "must encompass both the prohibited conduct and the mental state required by the statute." *Id.* (citing *United States v. 316 Units of Mun. Sec. in the Name of Efrain Gonzalez*, 725 F. Supp. 172, 177 (S.D.N.Y. 1989)). It meant only that proof of the underlying violation required proof that the party that engaged in structuring acted with "the mental state required by" the anti-structuring statute. As the New York opinion on which it relied makes clear, the Third Circuit did not hold that the property owner's intent is relevant when another party committed the criminal offense: "[I]t is not necessary for the government to show that the present owner of the property participated in a violation of the statute or was even aware of the violation." *316 Units*, 725 F. Supp. at 177.

The government proved that the criminal conspirators engaged in money laundering with the requisite intent. And, under subsection 983(c), the government bore no burden to prove Min Yang's intent. Because Min Yang's "requested instruction [did not] correctly state[] the law," the district court did not abuse its discretion by declining to give that instruction. *Lamonica*, 711 F.3d at 1309.

## C. Min Yang Is Not Entitled to Judgment as a Matter of Law or a New Trial.

Settled law governs Min Yang's motion for judgment as a matter of law or a new trial. After "a party has been fully heard on an issue during a jury trial," a court may "grant a motion for judgment as a matter of law against the party" if "the court finds that a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1), (1)(B). The district court must deny the motion "if substantial evidence exists in opposition to the motion such that reasonable people, exercising impartial judgment, might reach differing conclusions." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130 (11th Cir. 2018) (internal quotation marks omitted). That is, a judgment as a matter of law is appropriate only when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Lipphardt*, 267 F.3d at 1186 (internal quotation marks omitted). When considering the motion, the district court must "review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party . . . without making any credibility determinations or weighing evidence." *Commodores Ent. Corp.*, 879 F.3d at 1130 (internal quotation marks omitted). And a district court should grant a motion for a new trial only "when the verdict is against the clear weight of the evidence." *Lipphardt*, 267 F.3d at 1186 (internal quotation marks omitted). "Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* (internal quotation marks omitted).

Min Yang asserts that there was "overwhelming[]" evidence in support of his innocent-owner defense. Although he concedes

that there is no "affirmative statement on the record about his . . . state of knowledge at a given point in time," he argues that circumstantial evidence substantiated his defense. He states that the government's witnesses testified that the criminal conspirators "forged, copied, photoshopped or substituted" the Chinese nationals' signatures on the joint-venture and visa-application documents, and that there was no evidence the conspirators showed the documents to the Chinese nationals or "told [them] about the[] [criminal] operations." He also states that the Chinese nationals who attended trial all testified that "[t]hey had no knowledge of any illicit activity." And because, according to Min Yang, a government witness "testified that the applications submitted by the criminal defendants evinced the same approach throughout," Min Yang argues that the evidence permits an inference that he was just as in the dark as the Chinese nationals who testified.

We disagree. Because the government proved its prima facie case, Min Yang bore the burden of proving that he "did not know of the conduct giving rise to forfeiture." 18 U.S.C. § 983(d)(2)(A)(i). But missing from his summary of the testimony is any evidence explaining why Min Yang moved hundreds of thousands of dollars into an American bank account if not to add a veneer of legitimacy to the fictitious joint venture that would sponsor his admission into the United States. Without that explanation, the jury was left with evidence that tended to undermine his innocent-owner defense. For example, one conspirator testified that "the decision was made to have the Chinese nationals put $300,000 in the U.S." because the

money "would appear [to immigration authorities] to be a guaran-tee of the joint venture[s]," even though the joint ventures "were not real." Nevertheless, "as far as [the testifying conspirator] kn[ew], nobody ever rejected" the conspirators' direction to de-posit the funds. In the light of this testimony, the jury could rea-sonably have concluded that Min Yang had not satisfied his burden of proving that he "did not know of the conduct giving rise to for-feiture." 18 U.S.C. § 983(d)(2)(A)(i).

To be sure, some Chinese nationals offered other explana-tions as to why they moved money into American bank accounts. Lixin Zhau, for example, testified that the joint-venture agreement he signed required him to transfer "at least [$]285,000 in[to] a U.S. bank account." Qiang Xu and Yonghong Qiu testified that they be-lieved the funds would attract potential joint venture partners. Min Yang, by contrast, chose not to offer any testimony. And because the Chinese nationals who *did* testify offered varying justifications for their transfers of funds, Min Yang is wrong to contend that the jury's failure to infer his innocence from this varying testimony mandates judgment in his favor or a new trial. *See Lipphardt*, 267 F.3d at 1186 ("It is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences." (alteration adopted) (internal quotation marks omit-ted)).

Min Yang's final argument—that the government "provided not a single piece of evidence that supported any suggestion that [he] had actual knowledge of the criminal conduct"—is also

unpersuasive. Because the jury could have found that he had not satisfied his burden of proving his innocent-owner defense, the government had no need to offer evidence in rebuttal. The district court correctly denied Min Yang's motion for judgment as a matter of law or for a new trial.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the United States.