**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 19-4850**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICHA NARANG,

Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:16-cr-00043-LMB-5)

———————

Argued: May 7, 2021                    Decided: August 9, 2021

———————

Before FLOYD, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** John Cady Kiyonaga, LAW OFFICE OF JOHN C. KIYONAGA, Alexandria, Virginia, for Appellant. Jack Hanly, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Terrance G. Reed, LANKFORD & REED, PLLC, Alexandria, Virginia, for Appellant. G. Zachary Terwilliger, United States Attorney, Alexandria, Virginia, Richard D. Cooke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Richa Narang appeals her conviction of conspiracy to commit visa fraud and two counts of visa fraud. Following a strange procedural history, Narang and the government tried these counts in a one-day bench trial. Narang now appeals, arguing both that the court lacked jurisdiction over the trial and that she was convicted based on insufficient evidence. We reject both of Narang's arguments and affirm the judgment of the district court.

I.

The government's prosecution centered on Narang's role as a high-level employee of EcomNets—a Virginia corporation purportedly providing technology services while running a sophisticated visa fraud scheme. EcomNets's business model involved sponsoring H-1B visa beneficiaries and then placing them with third-party vendors for a fee. The government alleged at trial that EcomNets's business model depended on the submission of fraudulent applications for H-1B worker visas.

The H-1B visa program is a temporary-worker program, which admits roughly 65,000 applicants annually to work in specialty occupations requiring a bachelor's degree or its equivalent. 8 U.S.C. § 1184(g)(1)(A)(vii); 8 C.F.R. § 214.2(h)(4)(iii)(A). United States-based employers (the "petitioners") file petitions on behalf of non-citizen workers (the "beneficiaries") seeking U.S. Citizenship and Immigration Services (USCIS) approval for a beneficiary to work for a petitioner in the United States.

Before petitioners can file an H-1B petition with USCIS, they must first file a labor condition application (LCA) with the U.S. Department of Labor (DOL) promising to pay

2

the beneficiary the prevailing wage for their occupational classification. *See* 8 U.S.C. § 1182(n)(1)(A)(i), (D). Once approved, the petitioner files a form I-129 with USCIS for adjudication, appending supporting documentation. USCIS adjudicators seek to determine whether there is a genuine employer-employee relationship between the petitioner and the beneficiary. Because the H-1B visa is employment-based, adjudicators also look for evidence that the beneficiary's employment will begin "at the time indicated on the [I-]129 petition." J.A. 222–23. And adjudicators look for whether that employment will conform to the wage and location specifications in the LCA.

USCIS scrutiny is even greater for staffing companies like EcomNets. J.A. 223 (USCIS adjudicator testimony noting that the agency "heavily examine[s] the employer-employee relationship" for staffing companies). There is no per se prohibition against the use of shell companies or third-party staffing models by petitioners. If USCIS discovers, however, that documents were signed using fake names, that a staffing company would not begin seeking a placement until after a visa was granted, or that the listed job did not and would not exist at the time the visa was approved, USCIS would deny the petition.

EcomNets founder Raj Kosuri employed a small number of individuals at EcomNets's headquarters who assisted EcomNets's outside counsel in preparing LCAs and I-129 petitions for beneficiaries. These petitions listed EcomNets as the ultimate work location for beneficiaries, but EcomNets did not intend for the beneficiaries to work for EcomNets. Nor did EcomNets begin looking for third-party placement until after the H-1B visa was approved.

3

EcomNets took a number of steps to conceal its business model from USCIS adjudicators. First, Kosuri incorporated a series of shell companies—Unified Systems, United Tech, United Software Solutions, and Data Systems. These shell companies served as the petitioners on EcomNets's H-1B petitions but were not meaningfully independent from EcomNets. To create the appearance of independence, EcomNets falsified information about these companies in its visa petitions. EcomNets employee Sanchita Bhattacharya signed documents on behalf of United Tech as "Sonia Basu" and on behalf of United Software Solutions as "Sam Bose." Additionally, EcomNets included falsified leases for its shell companies in visa petitions.

The petitions usually falsely represented that these shell companies had contracted to place H-1B beneficiaries at a "Green Technology Center" owned by EcomNets in Danville, Virginia. J.A. 959–64. The petitions included contracts and purchase orders between the shells and EcomNets to support that assertion. In reality, there were no jobs available at what was an essentially empty warehouse and there was no plan for any H-1B beneficiary to work directly for EcomNets. EcomNets also falsified the signatures of beneficiaries on documents submitted to USCIS. EcomNets employees prepared offer letters to beneficiaries under the name of the shell companies reflecting this non-existent work. But once H-1B petitions were approved, EcomNets required beneficiaries to sign voluntary leave letters to avoid the company's obligation to pay beneficiaries. The company then began to look for third-party placements for its "benched" beneficiaries.

Narang played a central role in this scheme. EcomNets hired her in 2013 as its Senior Business Development Manager for IT services. One of her primary responsibilities

4

was to find job placements for EcomNets's approved visa beneficiaries. She also played a key role in preparing documents in support of the overall scheme. For instance, at trial the government presented emails from Narang requesting that other employees use pseudonyms to sign and prepare documents—purportedly on behalf of EcomNets's shell companies. Narang also signed contractor agreements and purchase orders in which EcomNets agreed to host a shell company's H-1B beneficiary at its non-existent Green Technology Center. These agreements were then included in the shell company's H-1B petition to USCIS. In total, Narang signed 178 documents—be they contractor agreements, purchase orders, or verification letters—that were submitted in H-1B petitions to USCIS.

The government also adduced evidence suggesting that Narang knew the fraudulent nature of EcomNets's business model. Witnesses testified that it was common knowledge that EcomNets never intended to place any beneficiary in its Danville, Virginia warehouse. One employee also testified that Narang simply smiled when told that Bhattacharya should not be signing documents under the false name "Sam Bose." That same employee witnessed Narang participate in forging beneficiary signatures on offer letters to be submitted with H-1B petitions. Narang also maintained a list of companies involved in the scheme, which names should be used to sign on behalf of each, and other pertinent information for each company. Narang stressed to co-workers the importance of not interchanging this information on applications.

## II.

On April 26, 2016, a grand jury returned an indictment against six employees of EcomNets and its shell companies. Narang was charged with conspiracy to commit visa fraud in violation of 18 U.S.C. § 371 and two counts of visa fraud in violation of 18 U.S.C. § 1546(a). On August 18, 2016, Narang pleaded guilty to one substituted count of wire fraud charged in a criminal information. As part of her plea agreement, Narang promised to cooperate by testifying against co-conspirators. The court subsequently dismissed all original indictment counts against Narang.

Two of Narang's co-defendants—Vikrant Jharia and Bhattacharya—went to trial. During trial, the two raised *Brady* and *Giglio* violations. Based on the government's discovery errors, the district court dismissed the indictment against them. Narang and her remaining co-defendants—Kosuri, Smriti Jharia, and Raimondo Piluso, who also pleaded guilty—subsequently moved to dismiss their charges in light of the government's misconduct. The court declined to dismiss the remaining charges but gave each defendant the option to withdraw their guilty pleas or renegotiate new plea deals with the government.

Jharia and Kosuri decided to simply renegotiate, rather than withdraw, their guilty pleas. At a status conference, Narang's counsel sought clarification on whether Narang's dismissed indictment counts needed to be presented a second time to the grand jury. J.A. 169 ("[T]he government has also taken the position that—you may recollect Ms. Narang pled to an information. The underlying indictment was dismissed, and the government's position is that the Court unilaterally can restore the indictment. My position is that they need to go back to the grand jury . . . ."). The court informed counsel that he could "brief

[the issue] for me if you want to, but my . . . gut instinct is there's no reason why the Court cannot reinstate the grand jury indictment." *Id.* The court then stated that Narang needed to decide if she was formally withdrawing her plea. If so, the court stated it would "vacate the plea colloquy and the findings connected with the plea, [and] reinstate the indictment against Ms. Narang," which would provide "the legal structure of the case." J.A. 171.

Narang filed a second motion to dismiss the information but did not challenge the government's or district court's ability to reinstate the earlier indictment. In its response, the government asked the district court to both deny Narang's motion to dismiss and reinstate the charges in the original indictment. At a hearing, the court denied Narang's original and second motions to dismiss and stated: "[T]he government . . . wanted the Court to vacate your client's guilty plea, reinstate the indictment, and set the case for trial. I'm not prepared to do that yet. I think—unless you're certain as to how your client wants to proceed at this time . . . ." J.A. 180. Narang's counsel immediately indicated that Narang was withdrawing her guilty plea and would like to proceed to trial. The parties and court then discussed potential trial dates with no further discussion of the indictment.

The court never entered a formal order reinstating the indictment, and the issue was never raised again by either party. Instead, Narang, the government, and the court all appear to have proceeded on the clear understanding that the indictment had been reinstated. The morning of trial, Narang moved "to exclude evidence of acts that are not *within the indictment*." J.A. 206 (emphasis added). After the court denied that motion, the parties conducted a one-day bench trial on the counts of conspiracy to commit visa fraud and visa fraud with which Narang was originally charged. The parties made specific

7

references to the indictment counts during closing arguments. *See, e.g.*, J.A. 500 (Narang's counsel noting that "Ms. Narang is charged in Count 1 with conspiracy, [and] Counts 6 and 7 with specific misstatements"). And at the conclusion of the trial, Narang filed a motion to dismiss the indictment without discussing any error in its reinstatement.

In a written order filed after trial concluded, the court noted that it had "reinstated the original indictment that had charged Narang with one count of conspiracy to commit visa fraud and two counts of visa fraud." J.A. 545. The court then denied Narang's motion to dismiss the indictment and found Narang guilty beyond a reasonable doubt on each count. The court ultimately sentenced Narang to six months of incarceration and two years of supervised release. Narang timely appealed the court's judgment.

III.

On appeal, Narang contends that the district court lacked jurisdiction over her indictment counts because the district court dismissed but never validly reinstated those charges. Second, Narang argues that the court lacked jurisdiction both because the immigration laws did not prohibit EcomNets's third-party staffing model and because those same laws were too uncertain to make her conduct a crime against the United States. Third, Narang challenges the sufficiency of the evidence used to convict her.

We review de novo whether the district court had jurisdiction over Narang's prosecution. *United States v. Barton*, 26 F.3d 490, 491 (4th Cir. 1994). Non-jurisdictional errors that were forfeited below are reviewed for plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993).

8

We review the sufficiency of the evidence following a bench trial under a deferential standard. We ask whether the court clearly erred in its factual findings and whether the district court's "ultimate" finding of guilt is supported by substantial evidence. *United States v. Lockhart*, 382 F.3d 447, 451 (4th Cir. 2004). Substantial evidence is that which, "viewed in the light most favorable to the Government," would permit any reasonable factfinder to find the elements established beyond a reasonable doubt. *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (en banc) (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).

## IV.

## A.

Narang first argues that the district court's dismissal of and failure to reinstate her indictment deprived the district court of jurisdiction over her criminal trial. Three statutes guide our resolution of this issue. First, 18 U.S.C. § 3231 gives district courts "original jurisdiction . . . of all offenses against the laws of the United States." 18 U.S.C. § 3231. A second statute, 18 U.S.C. § 3731, governs appellate jurisdiction over government appeals in criminal cases. That provision states that "an appeal by the United States shall lie to a court of appeals from . . . [an] order of a district court dismissing an indictment . . . within thirty days after the . . . order has been rendered." *Id.* § 3731. Third, 18 U.S.C. § 3296 permits district courts to revive previously dismissed indictments under specific conditions—namely, when (1) the original indictment counts were filed within the statute of limitations, (2) the indictment was dismissed pursuant to an agreement to plead to

9

substituted charges, (3) the defendant later successfully moved to vacate that guilty plea, and (4) the government moves for reinstatement within sixty days of the plea's vacatur. *Id.* § 3296(a)(1)–(4).

Narang argues that the interplay of § 3731 and § 3296 deprived the district court of jurisdiction over the indictment counts. According to Narang, § 3731 is a jurisdictional bar on the district court's ability to reconsider its prior dismissal of an indictment after thirty days. And because § 3731 is jurisdictional, § 3296 must also be jurisdictional because it operates as a limited exception to reopen the court's otherwise final order. But Narang believes the government did not properly move for—and the district court did not properly order—reinstatement of the indictment under § 3296, so the court did not have jurisdiction over her charges. The government contests Narang's argument that it and the district court did not comply with the requirements of § 3296. But we need not decide that question: Even assuming the indictment was not properly reinstated pursuant to that statute, Narang cannot demonstrate that the error was jurisdictional or that the error satisfies plain error review.[1]

We admit that the seeming lack of a valid charging document bears indicia of a jurisdictional defect—indeed, one may wonder what supports the court's jurisdiction in the

---

[1] The government argues that Narang raised and then abandoned this argument and asks us to find the argument waived. The government overplays its hand. Narang questioned whether the court could unilaterally restore her indictment and never pressed the issue when invited to do so by the court. But Narang's mere failure to press the claim is not the sort of intentional, explicit withdrawal of an identified issue required for waiver. *See United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) (citing *United States v. Rodriguez*, 311 F.3d 435, 437 (1st Cir. 2002)).

absence of such a document. However, the Supreme Court held in *United States v. Cotton* that a federal court's jurisdiction over criminal cases turns entirely on the "statutory or constitutional *power* to adjudicate the case." 535 U.S. 625, 630 (2002) (cleaned up). Following *Cotton*, we have explained "that the [constitutional] grand jury right, because waivable, does not involve subject-matter jurisdiction." *United States v. Hartwell*, 448 F.3d 707, 717 (4th Cir. 2006).

Modern courts have declined to read jurisdictional import into indictment defects because the judicial power to hear criminal prosecutions stems from § 3231, which confers subject-matter jurisdiction over all crimes against the United States. *See, e.g.*, *id.* at 716 ("Subject-matter jurisdiction (in the sense of judicial power) over federal criminal prosecutions is conferred on district courts by 18 U.S.C. § 3231."). Accordingly, we ask whether something in this case established the court's subject-matter jurisdiction by making clear the government was prosecuting federal offenses. *See United States v. Titterington*, 374 F.3d 453, 459 (6th Cir. 2004) (noting that if the government prosecuted state crimes, this would be "[a] true jurisdictional problem"); *United States v. McIntosh*, 704 F.3d 894, 902–03 (11th Cir. 2013) (noting that a conviction secured prior to the indictment's dismissal sufficed to "establish[] an offense against the United States").

Several unique facts compel the conclusion that the court retained subject-matter jurisdiction because Narang was being tried for crimes against the United States. First, no one disputes that Narang was originally charged pursuant to a valid indictment alleging conspiracy and two substantive counts of visa fraud—all federal offenses. Those charges were dismissed, but Narang's underlying criminal case continued pursuant to a substituted

11

charge of mail fraud—itself a federal offense.  Thus, at all times, Narang was before the court to answer for a crime against the United States.  Second, § 3296 permitted reinstatement of those dismissed charges as part of an ongoing criminal case without new presentment to a grand jury.  18 U.S.C. § 3296.  Indeed, the language appears to make that reinstatement *mandatory* when timely requested by a prosecutor.  *See id.* (noting the charges "*shall* be reinstated" (emphasis added)).  Thus, reinstatement was clearly a ministerial step.  Third, the government and the court clearly attempted to and believed they had reinstated the charges.  Fourth, the case was retried by all parties on the basis of the original charges.  On these facts, any technical failure to comply with § 3296 does not call into question the subject-matter jurisdiction of the court to try the three specific federal charges alleged in the original indictment.[2]

If Narang had objected on § 3296 grounds, the government or court could have easily remedied the error—especially because reinstatement is ministerial, not discretionary.  If the court had identified the error, it too could have easily requested the government move to reinstate the indictment and then enter a pro forma order.  Any technical issues with the reinstatement of Narang's indictment are less significant than other procedural errors courts have declined to treat as jurisdictional.  *See Cotton*, 535 U.S.

---

[2] Narang argues that the broad grant of jurisdiction pursuant to § 3231 must yield to the specific limitations on that jurisdiction imposed by § 3731 and § 3296.  But she fails to persuade us that the combined effect of the two statutes has jurisdictional import.  Even if § 3731 imposes a jurisdictional limit on a district court's authority to reconsider the merits of an indictment dismissal, § 3296 does not permit *reconsideration* of that previous order as erroneously granted.  The statute serves an entirely different function than § 3731— namely, it mandates the reinstatement of previously dismissed charges as part of an ongoing case following a defendant's withdrawal of a guilty plea to substituted charges.

at 631–62 (missing indictment element); *Hartwell*, 448 F.3d at 714–17 (improperly proceeding by information for capital offense).

Finally, the structure of § 3296 suggests the sixty-day deadline to move for reinstatement of an indictment is not jurisdictional. In relevant part, the statute requires "the United States [to] move[] to reinstate the dismissed counts within 60 days of the date on which the order vacating the plea becomes final." 18 U.S.C. § 3296(a)(4). The Supreme Court has held that Congress's decision to place a filing deadline in a separate part of a statutory scheme from its jurisdictional grant suggests the deadline is merely a claims-processing rule. *See United States v. Kwai Fun Wong*, 575 U.S. 402, 411–12 (2015). Here, the court's subject-matter jurisdiction is granted by § 3231, which does not condition the court's jurisdiction on compliance with the reinstatement provision.

Of course, the fact that an error is not jurisdictional does not mean it is not reversible. But Narang spends little time discussing how this Court should address the district court's errors if they are not jurisdictional. Because Narang did not press this argument to the district court, we are constrained to review for plain error. *Olano*, 507 U.S. at 731–32. Even assuming the district court plainly erred in a manner that violated Narang's substantial rights, we would not exercise our discretion to correct the error because it did not seriously affect the fairness, integrity, or public reputation of Narang's trial. *See United States v. Cedelle*, 89 F.3d 181, 186 (4th Cir. 1996) (asking whether "the proceedings resulted in a fair and reliable determination of . . . guilt"); *United States v. Collins*, 982 F.3d 236, 242 (4th Cir. 2020) (finding fairness was not affected where defendant had the

13

opportunity to "fully litigate" charges notwithstanding the error). We decline to overturn the otherwise fair and reliable results of Narang's trial on that basis.

## B.

Narang next argues her conviction must be overturned because the government's fraud theory was a thinly veiled attack against third-party staffing, which she contends was not clearly prohibited until after trial. Narang frames the issue as a jurisdictional one, seemingly arguing her conduct did not involve a crime against the United States. In advancing her theory, Narang argues that the immigration regulatory scheme for H-1B visas either did not, or at least did not clearly, prohibit the third-party staffing model used by EcomNets. Narang contends that the government is therefore prosecuting Narang for her participation in a staffing model that was not clearly criminalized, given the complexity and ambiguity of the relevant regulations. We need not delve deeply into these arguments, but Narang attempts to isolate specific portions of EcomNets's fraudulent scheme—for instance, failing to secure non-speculative work placements or benching beneficiaries— and argue they were either permitted or not within the purview of USCIS.

These contentions attempt to complicate a quite simple criminal rule: applicants may not make materially false statements in immigration applications. Regardless of whether EcomNets's underlying business model would violate immigration laws and regulations surrounding H-1B visas, Narang's charges relate to *fraud* in the visa application process. And the indictment charged both substantive violations of and conspiracy to violate 18 U.S.C. § 1546(a), which does not criminalize a staffing model, but making

14

materially *false statements* in an immigration application.  Narang's argument does not implicate the district court's power to hear this case.  *See Cotton*, 535 U.S. at 630–31 (reaffirming that district courts have jurisdiction over all crimes against the United States, and any objection that the indictment fails to allege a crime is a merits argument); *Lamar v. United States*, 240 U.S. 60, 64 (1916) ("Jurisdiction is a matter of power and covers wrong as well as right decisions.").

V.

Having disposed of Narang's jurisdictional arguments, we turn to the sufficiency of the evidence at trial.  We conclude Narang's arguments are without merit, given the impressive volume of testimonial and documentary evidence the government presented at trial and the court's thorough evaluation of the evidence.  We begin by examining Narang's conspiracy count before turning to her two substantive counts of immigration fraud.

A.

Conspiracy to commit immigration fraud is governed by 18 U.S.C. § 371, which criminalizes "two or more persons conspir[ing] . . . to defraud the United States . . . [when] one or more of such persons do any act to effect the object of the conspiracy."  18 U.S.C. § 371.  Here, the government accused Narang of conspiring to commit visa fraud pursuant to 18 U.S.C. § 1546(a), and therefore must establish (1) an agreement between co-conspirators to commit visa fraud; (2) Narang's willing participation in that conspiracy; and (3) an overt act by a co-conspirator to further the conspiracy.  *United States v. Camara*,

15

908 F.3d 41, 46 (4th Cir. 2018). Narang must have also participated in the conspiracy with at least the same mens rea required for the substantive act of visa fraud—namely, knowledge. *See Ingram v. United States*, 360 U.S. 672, 678 (1959); *see also* 18 U.S.C. § 1546(a). Both Narang's knowledge of and participation in the conspiracy can be established through circumstantial evidence. *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004).

We have no difficulty sustaining the court's order on this count, which was based on substantial evidence. The court correctly concluded that the "sustained efforts" of EcomNets employees "to prepare false LCAs and I-129 petitions," as well as the "coordinated and collaborative manner" in which those petitions were prepared, revealed the existence of a conspiracy, especially given consistent testimony that employees knew they were submitting false information. J.A. 558. The evidence at trial revealed Narang was intimately involved in the scheme. And Narang's responsibilities for placing beneficiaries with outside employers, her communications with other co-conspirators, and her signatures on false documents submitted to USCIS are all "fundamentally inconsistent" with a lack of knowledge about the conspiracy. J.A. 571. Furthermore, witnesses testified it was common knowledge that H-1B beneficiaries would not work at the Danville warehouse. Evidence also established Narang's knowledge that Bhattacharya signed documents under false names. This overwhelming evidence of a collaborative effort to falsify I-129 petitions also easily establishes the proof of an overt act. Accordingly, there was more than substantial evidence to support the court's finding of guilt on this count.

16

On appeal, Narang does not directly challenge this evidence nor meaningfully distinguish between her conspiracy and visa fraud counts. Instead, Narang makes a series of arguments about the elements of visa fraud, without specifying whether they are intended to defeat the existence of a criminal conspiracy or instead her underlying fraud counts. Regardless, each argument can be easily dispensed with.

*First*, Narang contends the government did not prove the materiality of statements made to USCIS adjudicators. A statement made to public officials is material when "it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (cleaned up). Narang contends the government has not proven the existence of a material statement because the representations to USCIS related to beneficiaries' work location and wages, which she argues are material to DOL's consideration of an LCA and whether it was complied with. But Narang argues that such statements are immaterial to USCIS's focus on a bona fide employment relationship and qualifying position. This argument ignores USCIS adjudicator testimony that these statements would be considered material when considering whether to accept an H-1B petition, particularly for staffing companies, which the agency more carefully scrutinizes. The court did not err in finding that the false representations made to USCIS were material.

*Second*, Narang asserts the court erred in finding that Narang and her co-conspirators had the required mens rea to commit visa fraud because the court improperly rejected her advice-of-counsel defense. Specifically, Narang contends the court erred by treating it as an affirmative defense, requiring her to show both full disclosure to

17

EcomNets's outside counsel and good faith reliance on counsel's advice. For support,

Narang cites a district court opinion stating that "good faith reliance on the advice of an

expert negates a defendant's *mens rea*, and therefore is not an affirmative defense." *United*

*States v. Stevens*, 771 F. Supp. 2d 556, 566 (D. Md. 2011) (citing *United States v. Miller*,

658 F.2d 235, 237 (4th Cir. 1981)). Regardless of whether the defense is technically an

affirmative one, we have held advice of counsel rebuts mens rea only when (1) a defendant

fully discloses pertinent facts to an attorney; and (2) relies in good faith on that advice. *See*

*Miller*, 658 F.2d at 237; *United States v. Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015).[3]

Narang failed to either call attorneys or present other evidence revealing the full extent of

the company's disclosure to outside counsel. The evidence at trial is entirely inconsistent

with a good-faith reliance on any advice received. And given the court's thorough analysis

of Narang's intent to make and knowledge of false information provided to USCIS, it did

not impermissibly shift the burden of proof to the defense. *See Westbrooks*, 780 F.3d at

596.

   *Third,* Narang argues the government did not prove that any false, material

statement was made in an immigration document required by law because it failed to allege

a violation of the regulations in effect when the statements were made. *See Caring Hearts*

*Pers. Home Servs. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016) (noting prosecution in

---

[3] Narang argues the court also erred in relying on *United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995), to hold that she could not rely on legal advice passed through Kosuri as an intermediary. We need not decide whether *Bostian* applies here because sufficient evidence supports the court's conclusion that—notwithstanding that case—the facts are inconsistent with good-faith reliance on counsel's advice by Narang.

Medicare fraud case relied on "more onerous" version of regulations than those in place at the time of the fraud). At the outset, § 1546(a) requires that the statement be made "in any application, affidavit, or other document required by the immigration laws." 18 U.S.C. § 1546(a). There is no dispute that I-129 petitions were required for beneficiaries to receive an H-1B petition. *Cf. United States v. Jimenez*, 972 F.3d 1183, 1192 (11th Cir. 2020) (concluding that I-140 forms are documents required by immigration laws and thus satisfy this element). And the district court questioned the USCIS adjudicator at trial to confirm that the I-129 instructions presented by the government were similar in substance to those in effect at the time of the conspiracy. Accordingly, there was substantial evidence that the statements were made in an application required by immigration laws and regulations.

### B.

Finally, we contend with Narang's two substantive convictions for visa fraud pursuant to 18 U.S.C. § 1546(a). In particular, the government charged Narang with immigration fraud related to EcomNets's H-1B applications for "Chandra B." and "Gautami S." J.A. 61. One way of proving visa fraud is to show a defendant (1) knowingly (2) made a false statement (3) under oath (4) that was material to the immigration decision and (5) that the false statement was made in a document required by United States immigration laws or regulations. 18 U.S.C. § 1546(a); *United States v. Jabateh*, 974 F.3d 281, 302–03 (3d Cir. 2020). Importantly, Narang did not personally sign any of the visa petitions under penalty of perjury. Instead, she merely signed documents containing falsehoods that were included as part of the overall I-129s certified by other co-

conspirators. The court did not resolve whether § 1546(a)'s oath element is satisfied by a false statement not made under penalty of perjury but contained in an application that is itself submitted under penalty of perjury. Instead, the court relied on co-conspirator liability pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946), to convict Narang for her co-conspirator's substantive visa fraud violations.[4] *Pinkerton* liability permits a co-conspirator to be convicted as a principal for crimes committed by a co-conspirator when "reasonably foreseeable and in furtherance of the conspiracy." *United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010). We take each count in turn.

One visa-fraud count involved an I-129 submitted by "Data Systems" on behalf of beneficiary Chandra B. Unindicted co-conspirator Ravi Kaur signed multiple certifications under penalty of perjury that gave the false impression Chandra B. would be subcontracted to work at EcomNets's Green Technology Center. Kaur testified that she knew her representations were false. And the court did not clearly err in finding these representations material in light of the adjudicator's trial testimony that false representations as to location or the employer-employee relationship could result in the denial of a petition. Nor did the court err in concluding that this instance of visa fraud was both in furtherance of EcomNets's overall conspiracy and foreseeable to Narang. Indeed, the submission of this I-129 was part of the company's overall scheme to fraudulently procure H-1B visas. Furthermore, Narang signed false documents submitted with the petition representing a

---

[4] The district court also analyzed whether Narang could be held liable under a theory of aiding and abetting pursuant to 18 U.S.C. § 2. We do not discuss this alternate holding, given the sufficiency of the evidence to support *Pinkerton* liability.

non-existent contractor relationship between Data Systems and EcomNets. Accordingly, there was substantial evidence to support Narang's conviction under a *Pinkerton* theory.

The other visa-fraud count involved a similar I-129, this time submitted by United Tech on behalf of Gautami S. and again including false documents signed by Narang. As the court correctly found, the I-129 itself was signed under oath by "Sonia Basu" and contained falsehoods as to Gautami S.'s future role as a Green Technology Center contractor. The trial did not establish who signed the document. But the court did not clearly err in concluding that it was one of Narang's co-conspirators in light of trial testimony that this false name was used to sign documents on behalf of United Tech, and that the name was used falsely in Gautami S.'s petition. *See* J.A. 373 (testimony of Kaur agreeing that "a fake person was certifying as to the truthfulness of these documents"). For the same reasons as the other petition, the court did not err in concluding these statements were false, material, made knowingly in furtherance of the overall conspiracy, and foreseeable to Narang. Substantial evidence supports Narang's conviction on this count.

VI.

For the foregoing reasons, the district court's judgment is

*AFFIRMED.*

21