**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-1661**

_____

CHUNCHENG REN; ELIZUR INTERNATIONAL, INC.,

Plaintiffs – Appellants,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

Defendant – Appellee.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Roderick Charles Young, District Judge.  (2:19-cv-00659-RCY-LRL)

_____

Argued:  December 8, 2022                         Decided:  February 14, 2023

_____

Before NIEMEYER, AGEE, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge Niemeyer and Judge Quattlebaum joined.

_____

**ARGUED:**  Geoffrey Forney, Philadelphia, Pennsylvania, for Appellants.  Anna Maria McKenzie, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:**  Raj Parekh, Acting United States Attorney, Alexandria, Virginia, Daniel P. Shean, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

_____

AGEE, Circuit Judge:

Elizur International Inc. ("Elizur") filed a Form I-140 Immigration Petition for Alien Worker on behalf of its employee Chuncheng Ren, seeking to permanently employ Ren in the United States as a multinational executive or manager under the Immigration and Nationality Act ("INA"). The United States Citizenship and Immigration Services ("USCIS") denied Elizur's petition. Rather than file an administrative appeal, Elizur and Ren sued in federal court and lost. We affirm.

I.

Elizur, a Virginia-based company, is a wholly owned subsidiary of China-based company Triple-R International Glass Co., Ltd. ("Triple-R"). Triple-R produces handmade glass products, which Elizur markets in the United States.

Ren, a Chinese native and citizen, served as Triple-R's general manager from November 2009 to March 2015 before joining then-newly created Elizur as its president. At that point, Ren lawfully entered the United States on a one-year L-1A visa—a nonimmigrant visa reserved for intracompany transferee managers and executives. *See* 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(*l*)(1)(i). Ren later received three two-year extensions of his temporary visa, the maximum allowed, authorizing Ren to stay in the United States through January 1, 2022. *See* 8 C.F.R. § 214.2(*l*)(7)(i)(A)(3), (*l*)(15)(ii).

2

In 2018, after Ren received the first two extensions but before he received the third and final extension, Elizur filed a Form I-140 petition for Ren.[1] In doing so, Elizur initiated the process that would permit Ren to be employed permanently in the United States as a multinational manager or executive, as defined in 8 U.S.C. § 1153(b)(1)(C).[2]

Finding the initial submission lacking, the USCIS requested additional evidence from Elizur showing that Ren worked in a qualifying managerial or executive capacity at Triple-R and that he would work in such a capacity at Elizur going forward—both as required by the INA. *See* 8 U.S.C. § 1153(b)(1)(C); 8 C.F.R. § 204.5(j)(3)(i)(B), (5). Specifically, the agency requested a breakdown of Ren's daily duties, including the percentage of time spent on each duty, and certain information about the employees who reported directly to him. Elizur in turn submitted organizational charts for both companies

---

[1] The United States employer must file the Form I-140 petition on the alien's behalf. 8 C.F.R. § 204.5(c), (j)(1).

[2] Section 1153(b)(1)(C) deals with the allocation of EB-1C immigrant visas for multinational executives and managers, which provide for permanent legal residence in the United States. *See* 8 U.S.C. §§ 1151(a)(2), 1153(b)(1)(C); *United States v. Approximately $299,873.70 Seized From a Bank of Am. Acct.*, 15 F.4th 1332, 1335 (11th Cir. 2021) ("Like other employment-based visas, the EB-1C visa provides the recipient a basis for becoming a lawful permanent resident and perhaps later a citizen."). Because Ren was already lawfully in the United States on a temporary L-1A visa, however, to become a lawful permanent resident, he had to secure "adjustment of status" rather than an immigrant visa. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 46 n.1 (2014) (citing 8 U.S.C. § 1255(a)); *see also* J.A. 146 (Elizur's Form I-140 petition indicating that Ren "will apply for adjustment of status"). Even so, "the criteria for securing adjustment of status and obtaining an immigrant visa are materially identical," *Scialabba*, 573 U.S. at 46 n.1, as adjustment of status requires that the alien be statutorily eligible for an immigrant visa, 8 U.S.C. § 1255(a). Here, that means that, among other requirements for adjustment of status, Elizur had to demonstrate Ren's eligibility for an EB-1C visa, which, in turn, required a USCIS-approved Form I-140 petition. *See id.*; 8 C.F.R. §§ 204.5(j)(1), (n)(1), 245.1(a).

as well as letters from Triple-R's deputy general manager and Elizur's chief operating officer purporting to further detail Ren's duties and achievements at the respective companies.

After receiving these supplemental submissions, the USCIS denied the Form I-140 petition. The agency's written decision explained that Elizur's evidence, including the supplemental materials, did not adequately show that Ren was employed in a qualifying capacity at Triple-R or that he would function in such a capacity at Elizur—each finding independently precluding approval of the petition.

Elizur and Ren filed suit in federal district court pursuant to the Administrative Procedure Act ("APA"), challenging the agency's denial of the Form I-140 petition as arbitrary and capricious. *See* 5 U.S.C. §§ 702, 704, 706(2)(A).

Following cross-motions for summary judgment, the district court granted summary judgment to the USCIS, concluding that the agency did not commit a clear error of judgment in finding that Elizur failed to demonstrate that Ren worked in a managerial or executive capacity at Triple-R or that Ren worked, or would later work, in either capacity at Elizur.

Elizur and Ren appealed. We have jurisdiction under 28 U.S.C. § 1291.[3]

---

[3] Critically, the challenged agency decision here is the denial of a Form I-140 petition. As indicated in footnote 2 above, an approved Form I-140 petition is a prerequisite to securing adjustment of status under 8 U.S.C. § 1255(a), but whether to approve the petition and whether to grant adjustment of status are two separate agency decisions. *Compare* 8 C.F.R. § 204.5(n)(1), *with* 8 C.F.R. § 245.1(a). Thus, although the INA proscribes "judicial review of certain discretionary agency decisions, including the denial
(Continued)

II.

We review de novo the district court's evaluation of a challenged agency action under the APA, meaning that we independently assess whether, based on the administrative record, the agency action was unlawful. *Fishermen's Dock Coop., Inc. v. Brown*, 75 F.3d 164, 168 (4th Cir. 1996).

The APA instructs federal courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, our review is "narrow" and "highly deferential," *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009), meaning that "we look only to see if there has been a 'clear error of judgment,'" *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287 (4th Cir. 1999) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). In other words, we need only "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). To that end, we normally will not set aside agency action as arbitrary and capricious unless the agency relies on inappropriate factors, ignores a critical issue, or reaches a decision that is flatly contradicted by the evidence or is otherwise implausible. *Hughes River*, 165 F.3d at 287–88 (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

---

of an application for adjustment of status" under 8 U.S.C. § 1255(a), *Lee v. U.S. Citizenship & Immigr. Servs.*, 592 F.3d 612, 619 (4th Cir. 2010) (citing 8 U.S.C. § 1252(a)(2)(B)), that jurisdiction-limiting provision is inapplicable here because, as stated above, Elizur and Ren are not challenging the denial of an adjustment-of-status application.

III.

A.

To qualify as a multinational manager or executive under the INA, the alien must satisfy two criteria. First, the alien, in the three years immediately preceding the filing of the application—or for an alien already lawfully in the United States like Ren, in the three years preceding admission as a nonimmigrant—must have been employed outside the United States for at least one year in a managerial or executive capacity. 8 U.S.C. § 1153(b)(1)(C); 8 C.F.R. § 204.5(j)(3)(i). Second, the alien must seek to enter the United States to continue to render services to the same employer, or to a subsidiary or affiliate thereof, in a managerial or executive capacity. 8 U.S.C. § 1153(b)(1)(C); 8 C.F.R. § 204.5(j)(3)(i)(C), (5). Failure to satisfy either one of these requirements is fatal to the petition. And here, the USCIS found that Ren failed both.

To assess that determination, we must first consider what it means to function in a managerial or executive capacity and the level of proof required to show that the putative beneficiary has functioned or will function in such a capacity.

The INA directly addresses the first issue, setting forth the specific criteria:

> (A) The term "managerial capacity" means an assignment within an organization in which the employee primarily--
>
> > (i)    manages the organization, or a department, subdivision, function, or component of the organization;
> >
> > (ii)   supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

6

(iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and

(iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

(B) The term "executive capacity" means an assignment within an organization in which the employee primarily--

(i) directs the management of the organization or a major component or function of the organization;

(ii) establishes the goals and policies of the organization, component, or function;

(iii) exercises wide latitude in discretionary decision-making; and

(iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

8 U.S.C. § 1101(a)(44)(A)–(B); *accord* 8 C.F.R. § 204.5(j)(2), (4)(i).[4]

Neither this Court nor the Supreme Court has closely examined the requisite level of proof to establish that an employee has worked or will work in a managerial or executive role. But other courts uniformly hold that the petitioner (*i.e.*, the sponsoring employer) must submit a *detailed* list of the job-related tasks that the putative beneficiary has

---

[4] The agency may also consider, to a degree, the employer's staffing levels to determine whether the putative beneficiary has acted or will act in a managerial or executive capacity. *See* 8 U.S.C. § 1101(a)(44)(C); 8 C.F.R. § 204.5(j)(4)(ii).

performed or will perform; general or vague descriptions are insufficient. *See, e.g.*, *Pride Holdings, LLC v. Nielson*, No. 19 C 659, 2020 WL 833087, at *2 (N.D. Ill. Feb. 20, 2020) ("It is well-established that 'general descriptions of business-related tasks . . . do not demonstrate that a beneficiary's proposed duties are primarily managerial or executive.'" (alteration in original) (quoting *Khamisani v. Holder*, No. H–10–0728, 2011 WL 1232906, at *7 (S.D. Tex. Mar. 31, 2011))); *Tianhai Elec. N. Am., Inc. v. Johnson*, No. 14-cv-10016, 2015 WL 12731911, at *3–4 (E.D. Mich. Dec. 8, 2015) (observing that "[c]ourts evaluating USCIS denials of employment-based visas have stressed the importance of specifics" and upholding agency denial of a Form I-140 petition where "[m]any of the job descriptions offer[ed] little insight into [the putative beneficiary's] day-to-day role at the company"); *A&T Fin. Servs., Inc. v. Rosenberg*, No. SACV 14-780-JLS (RNBx), 2015 WL 10939900, at *5 (C.D. Cal. Mar. 2, 2015) (stating that the petitioner "must specify the nature of the proposed beneficiary's duties" because "[t]he actual duties themselves reveal the true nature of the employment" (alteration in original) (quoting *Fedin Bros. Co. v. Sava*, 724 F. Supp. 1103, 1108 (E.D.N.Y. 1989))).[5]

---

[5] Courts have likewise required specific job descriptions in the context of L-1A nonimmigrant visas, which are governed largely by the same standards as those governing EB-1C visas. *See, e.g.*, *VHV Jewelers, LLC v. Wolf*, 17 F.4th 109, 113, 115 (11th Cir. 2021) (finding that the agency did not arbitrarily or capriciously deny an L-1A petition where the employee's job descriptions were "overly broad and generic and did not provide sufficient insight into the actual nature of [the employee's] role within the organization"); *Brazil Quality Stones, Inc. v. Chertoff*, 531 F.3d 1063, 1070 (9th Cir. 2008) (holding that the denial of an L-1A petition was not arbitrary and capricious because "the documents submitted to the agency d[id] not describe with particularity what [the employee's] duties entailed"); *Fedin Bros.*, 724 F. Supp. at 1108 (granting summary judgment to the agency (Continued)

We find this line of cases instructive and persuasive, and we similarly hold that the petitioner must provide specific details concerning the putative beneficiary's job-related tasks. Without such specifics, the agency is hamstrung in its ability to determine whether the putative beneficiary has been or will be employed in the required managerial or executive role.

But a thorough job description is not enough. Rather, that description must also reveal that the putative beneficiary's duties have been or will be "primarily" managerial or executive in nature. 8 U.S.C. § 1101(a)(44)(A)–(B); 8 C.F.R. § 204.5(j)(2). That the employee's duties involve *some* managerial or executive tasks will not do: "such tasks must encompass his *primary* responsibilities." *Chertoff*, 531 F.3d at 1070 (involving L-1A visa petition); *see also Yogi Metals Grp., Inc. v. Garland*, 38 F.4th 455, 457, 458–59 (5th Cir. 2022) (upholding agency denial of a Form I-140 petition where the employee's managerial tasks accounted for only 35 percent of the employee's time).

With these principles in mind, we turn to the case at hand.

B.

The USCIS concluded that Elizur failed to supply sufficient evidence demonstrating that Ren was employed in a managerial or executive capacity as general manager of Triple-R prior to his admission into the United States. Citing specific portions of Elizur's evidence, the agency observed that the description of Ren's employment activities at the

---

on its denial of an L-1A petition where the petitioner failed to describe "how, when, where, and with whom [the employee's duties] occurred"); *see also* 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(*l*)(3).

Chinese company was "extremely vague and duplicative" and "fail[ed] to provide any meaningful detail or explanation of [Ren's] actual day-to-day job duties in the course of his daily routine." J.A. 42. In the agency's view, this perceived deficiency precluded a finding that Ren primarily performed managerial or executive duties at Triple-R.

Having reviewed the administrative record, we conclude that the agency did not commit a clear error in judgment. The record contains ample support for the agency's conclusion that Elizur failed to provide the necessary level of detail as to Ren's duties to permit the agency to conclude that Ren functioned in a managerial or executive capacity while employed at Triple-R.

In its second submission to the USCIS, Elizur tendered a letter from Triple-R summarizing Ren's duties in a bullet-point list, which we replicate below:

- Established various plans as to the marketing plan for the Company and implementation and use of advanced Quality control measuring products. Reviewed annual, quarterly, and monthly operational records and reports to project gross sales of the company's products (Total of 20%);

- Formulated, directed and coordinated company sales activities and policies. Monitored the cash flow and financial auditing of the company, and periodically reported to the Board of Directors of the Parent Company (Total of 20%) overall Company results [sic];

- Met with department managers, executives and key professionals on a regular basis to review and discuss work progress; coordinated the relationship among the various departments and strengthened the cooperation of each department to further the effectiveness of inter-departmental functions (Total of 20%);

- Hired and/or dismissed employees under Mr. Ren's supervision. Planned and monitored staff progress and training. Reviewed & evaluated employee performance results and approved salaries and annual rewards (Total of 20%); and

10

- Established and maintained smooth communication channels with clients, suppliers, government agencies, financial institutes and other departments; responsible for public relations to establish sound corporate image (Total of 20%).

J.A. 56.

Triple-R's letter also contained statements like the following:

- "[Ren] managed the company's overall strategic direction, organizational structure, and supervision of the work of subordinated departments and employees. He functioned at a top level within the organizational hierarchy and made executive level decisions on strategic daily operations. That overall management authority then flowed down through his subordinate supervisors for front line action." J.A. 55.

- "Ren held the day-to-day responsibility for the supervision and operation of the company's high-level marketing, strategic production and administrative organizational functions, and new product development." J.A. 55.

- "Ren was responsible for implementing all Corporate strategies and organizational planning policies to ensure the continued development of all [Triple-R's] employees under his management. He was required to exercise a high-level of autonomy and discretionary decision-making with regard to prioritizing the duties of his management responsibilities on a day-by-day basis." J.A. 55.

- "Ren was responsible for leading the overall management and implementation of the whole company's strategy mission. . . . [H]e also had overall and full responsibility for conducting board meetings, determining and developing the company's business objectives and strategies, establishing annual financial plans and establishing plans for major international collaborative relationships." J.A. 56.

- "Ren was also responsible for overall human resources management and authority. He exercised broad latitude in discretionary day-to-day decision-making concerning employee hiring, performance reviews, promotions and termination for the employees under his immediate supervision." J.A. 57.

These generic and vague statements, many of which the agency cited in its decision, fall well short of what's required to demonstrate that Ren primarily performed managerial or executive functions. *See Pride Holdings*, 2020 WL 833087, at *3 (stating that "inexact

11

descriptions . . . are insufficient to establish that an employee acts in [a qualifying] capacity" and collecting cases upholding agency denials of Form I-140 petitions where the petitioners used similarly vague job descriptions).

Elizur and Ren assert that the agency impermissibly cherry-picked statements from Triple-R's letter while ignoring others, including statements detailing Ren's achievements as general manager. As an initial matter, we disagree with their characterization. The USCIS fairly described the whole submission, and it did so by highlighting specific passages that supported its decision. The four-page portion of Triple-R's letter that Elizur and Ren claim to be sufficiently specific is filled with fluffy descriptions devoid of any real substance. Indeed, it largely reads more like a collection of one-liners useful for resume drafting than a meaningful description of the duties that Ren actually performed. *See, e.g.*, J.A. 55 ("Mr. Ren provided managerial and executive leadership to the marketing/product development functions; he implemented new business acquisition initiatives to ensure Triple-R['s] continuous growth and sustainability in the global markets.").

But even accepting that the agency did not explicitly discuss a handful of arguably more-specific achievements recounted in the letter,[6] that fact doesn't render the agency's

---

[6] For example, the letter states that Ren (1) "introduced an Enterprise Resource Planning (ERP) management system, which built complete core systems and rules for HR management, financial management and business management"; (2) led participation efforts in "major international fairs (such as the Canton Fair)"; (3) introduced "worker-friendly ergonomic workbenches"; (4) "introduce[d] the very advanced, internationally recognized Tempering Valve Safety System for the Production Department to ensure . . . absolute safety through the entire production process"; and (5) "introduced the Gasifier system to greatly reduce the energy consumption for the enterprise and the product manufacturing cost." J.A. 57.

12

decision arbitrary and capricious. As we explained in *Casalena v. U.S. Immigration &
Naturalization Service*—albeit in the context of deportation proceedings—the agency is
not required to "mention every relevant fact in its opinion." 984 F.2d 105, 107 (4th Cir.
1992)) (quoting *Vergara-Molina v. Immigr. & Naturalization Serv.*, 956 F.2d 682, 685 (7th
Cir. 1992)). Indeed, so long as the agency "has given reasoned consideration to the petition,
and made adequate findings, we will not require that it address specifically each claim the
petitioner made or each piece of evidence the petitioner presented." *Id.* (quoting *Martinez
v. Immigr. & Naturalization Serv.*, 970 F.2d 973, 976 (1st Cir. 1992)); *see also id.* (stating
that the agency is not required to "write an exegesis on every contention" (quoting
*Vergara-Molina*, 956 F.2d at 685)).

Here, like in *Casalena*, the agency "explicitly stated that it had reviewed the entire
record." *Id.*; *see* J.A. 44 (agency stating that it had conducted "a careful review and analysis
of all evidence within the record"). And when viewed in the broader context of a letter that
otherwise largely contains indefinite job descriptions lacking substantive worth, the
inclusion of those few relatively specific achievements affords no basis to hold that the
agency committed a clear error of judgment.[7] *See Casalena*, 984 F.2d at 107 (explaining

---

[7] For similar reasons, we are unpersuaded by Elizur and Ren's argument that the
agency failed to address evidence showing that Ren directed the parent company's
operations through management who controlled the day-to-day operations of the
organization. But even considering that evidence, it does not carry the force that Elizur and
Ren posit. Instead, it reveals that of the five full-time department managers that Ren
directly oversaw, none had higher than a junior-college degree—one had only a high-
school degree—and four had salaries of less than $16,000 per year. These facts are not
particularly persuasive evidence that Ren "supervise[d] and control[led] the work of other
(Continued)

that the agency's failure to discuss certain factors in its decision was not reversible error where the agency "might simply have found those factors insufficiently significant to merit individual mention, a finding for which there would have been record support").

Elizur and Ren further argue that the agency impermissibly imposed a requirement not found in the INA—that the putative beneficiary's executive duties must be stated in terms of "day-to-day duties" showing a "daily routine." J.A. 42. That argument is meritless.

The agency's decision correctly recited the definition of "executive capacity." J.A. 40. And in requesting supplemental evidence about Ren's "specific daily duties" along with the "[p]ercentage of time spent on each duty," J.A. 47, the agency did not add to that definition. Rather, it requested appropriate additional evidence to help it assess whether Ren's position fit the executive-capacity mold. INA regulations specifically empower the agency to do just that. *See* 8 C.F.R. § 204.5(j)(3)(ii). And we see nothing improper about the agency's exercise of that power here: A petitioner's failure to furnish evidence of specific day-to-day duties forms a common component of both agency denials of Form I-140 petitions and courts' review of those denials. *See, e.g.*, *Saga Overseas, LLC v. Johnson*, 200 F. Supp. 3d 1341, 1344, 1347 (S.D. Fla. 2016) (upholding agency denial in the L-1A visa context where the petitioner's "descriptions of [the putative beneficiary's] job duties

---

*supervisory, professional, or managerial* employees," as the statute requires. 8 U.S.C. § 1101(a)(44)(A)(ii) (emphasis added). Rather, as the agency found, those facts are "more indicative of an individual . . . acting as a first line supervisor," J.A. 44, which, standing alone, is insufficient to prove that a person is acting in a managerial capacity, *see* 8 U.S.C. § 1101(a)(44)(A) ("A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.").

14

fail[ed] to convey an understanding of exactly what the beneficiary will be doing *on a day-to-day basis*" (emphasis added) (internal quotation marks omitted)); *Tianhai Elec.*, 2015 WL 12731911, at *4 ("After reviewing the administrative record, the Court still does not know what [the putative beneficiary's] job actually entails. Many of the job descriptions offer little insight into his *day-to-day role* at the company, or whether that role satisfies the regulations." (emphasis added)). We therefore reject Elizur and Ren's contention that the agency improperly expanded the statutory definition of "executive capacity."

\* \* \* \*

The agency reasonably concluded that Elizur failed to carry its burden of showing that Ren primarily performed managerial or executive duties at Triple-R. That evidentiary failure provides an independent basis to affirm the judgment below, so we need not address the agency's finding that Elizur also failed to prove that it would employ Ren in a qualifying role going forward.

IV.

For the reasons stated, the USCIS's denial of Elizur's Form I-140 petition was not arbitrary and capricious. Accordingly, we affirm the district court's judgment.

*AFFIRMED*

15